*Forensic Evidence & Investigations*
*Lewis Gordon*
*Forensiclg@gmail.com*
*(413)896-9729*

My name is Lewis H. Gordon, of Forensic Evidence & Investigations, where I provide

consultant forensic science services throughout the United States in case analysis, trial

preparation, and post-trial strategy, in the area including, but not limited to: ballistics/firearms'

examination and crime scene reconstruction, including shooting incident reconstruction.  My

curriculum vitae is being submitted, which outlines my credentials including a Masters of

Science in Forensic Science from the University of New Haven, as well a Juris Doctorate from

Western New England School of Law.

**Objectives**

I was contacted by Mr. Gordon Spencer, Esq., counsel for Mr. David Yarde, a Defendant

who was convicted of second degree murder and unlawful possession of a firearm, in connection

with the shooting death of a Mr. Deandre Russ ("Mr. Russ") – a person who was shot and killed

outside an apartment building located at 1050 Tremont Street in Boston, MA on October 28,

2012.  Attorney Spencer has requested I review and analyze materials from a shooting incident

from: i) a perspective of reconstruction, as well as from: ii) a firearms examination perspective.

These materials included pre-trial discovery, trial transcripts and subsequent reports from other

experts.

With respect to an approach involving shooting incident reconstruction, I was asked to

review the series of events leading up to this shooting, and attempt to determine whether Mr.

Yarde could have been the shooter in his last known position, or in the alternative, determine

whether Mr. Yarde could have moved to a location where he could have been the shooter, based

upon the time constraints the evidentiary materials have dictated.   From a firearm examination approach, I was also asked to determine if all relevant examinations were conducted and comprehensively presented at trial.

Should additional information become available, I retain the ability to review said new materials and alter my opinions should that be warranted.

**The materials I have relied upon include:**

1. Autopsy report OCME 2012-13065 - 10/30/2012;

2. Dr. Kimberly Springer, OCME trial testimony regarding the autopsy report on Mr. Deandre Russ;

3. Autopsy Photographs of Mr. Deandre Russ;

4. Excerpts of surveillance videos and still frames from cameras located at 1050 Tremont Street, Boston, Ma;

5. Crime Scene sketches and diagrams of the shooting scene, including recovered fired cartridge cases;

6. Sketches and measurements of evidence located at the crime scene by Officer Stephen Moy of the Boston Police Department ("BPD");

7. Testimony of Officer Mammone, BPD, Detective Doogan, BPD, Detective Zingg, BPD, Officer Coyne, BPD, and John Collins;

8. Expert report of Dr. Jonathan Arden;

9. Expert report of Dr. Elizabeth LaPosata;

10. Expert report of Mr. Michael Garneau, Rampion Visual Productions;

11. Testimony of Detective Tyrone Camper;

12. My own observations, measurements and photographs of the scene taken on November 16, 2020.;

## Factual Evidence

### a. *Surveillance Video*

There are a number of video surveillance cameras located on the exterior of the building at 1050 Tremont Street.  These cameras provide substantial evidence of the events leading up to and immediately following the moment when Mr. Russ was shot and killed.  The cameras pan away from the shooting at the instant the shots are fired and therefore do not show the actual shooting.  The cameras do however provide a very specific frame of reference, assisting in creating a foundation for determining how the shooting occurred.  The January 28, 2019 report of Mr. Garneau of Rampion Visual Productions, details where the cameras are located, and how they work. I have adopted all of his report as the basis for finding the following facts:

    1. Camera #14 is located on the column on the east side of the entrance way to 1050 Tremont. It pans a 180 degree area of view. Camera #14 shows the interaction of four individuals near the base of the column that separates the office at 1042 and 1044 Tremont from 2:17:55 to 2:18:03 AM. The time on the camera is one hour behind the actual time which is 3:18 AM. The video shows the victim Mr. Deandre Russ standing on the North (Tremont Street side) of the column. David Yarde and two other individuals are standing on the South side (building side) of the column. (*See exhibit 1 – Still photo and diagram with North, South, East, West directionals*);

    2. Two seconds later, at 2:18:02 AM, Mr. Yarde can be seen to move to the west of the column as Mr. Russ also moves to the west of the column. This is the last time the interaction between Mr. Yarde and Mr. Russ can be seen in any video. (*See exhibit 2 – Still Photo*);

    3. At 2:18:03 AM Camera #7 located on the west side of the column 1042/44 shows Mr. Russ falling to the ground approximately six feet to the west of the column 1042/44. (*See exhibit 3 – Still photos*):[1]

### b.  Autopsy Evidence

Deandre Russ was transported from the scene to the hospital where he died of major brain injuries.  The autopsy was conducted by Dr. Kimberly Springer of the Massachusetts Office of the Chief Medical Examiner.  The autopsy revealed that the cause of death was a single

---

[1] It is obvious that based upon the footage, and opinion of Mr. Garneau, which I adopt, that Mr. Russ was shot in the one second between 2:18:02 and 2:18:03.  Further, I obtained the distance of Mr. Russ falling to the ground approximately six feet to the West of the column 1042/44 from the sketch of Officer Stephen Moy – attached as *exhibit 4*.

gunshot wound to the left forehead which passed through the skull and exited through the right parietal area.  Mr. Russ also suffered two perforating wounds to the left thigh and right calf.  Dr. Springer also noted that she observed gun powder stippling on Mr. Russ's face. Dr. Laposata opined that the gunshot wound to the head would cause immediate unconsciousness and collapse.

Dr. Springer noted the distribution of the gun powder stippling had a dimension of "4.5 inches by 6.0", and determined that the range of fire was on the order of 36 inches. Dr. Springer's autopsy findings were confirmed by Dr. Johnathan Arden and Dr. Elizabeth LaPosata in separate reports dated January 21, 2018 and January 18, 2019, respectively.  Both reports are in substantial concurrence. The opinions of the medical examiners are substantiated by research on muzzle to target distance determination. *See exhibit 5.*

Based upon the same testimony and reports regarding the stippling, relying upon my outlined training and experience to concur with the same, I opine to a reasonable degree of scientific certainty that **the distance from the muzzle of the firearm belonging to the shooter, to Mr. Russ's forehead was about 36 inches maximum**. I don't believe that this finding would be in dispute.

    *c.  Trajectory Evidence*

Of further note, after review of the autopsy and expert reports, is that the three projectiles which struck and penetrated Mr. Russ were not recovered in his body.  The trajectory of the fatal shot to his head was from left to right, front to back, and very slightly upward.  The trajectory of the shot to his left thigh was also left to right, back to front, and upward.  This information alone has restricted value, as it has very limited application in determining the location of the shooter. This is due to the mobility of the human body and the numerous ways it can articulate and rotate.

This is compounded by the fact that the shooter can also vary their position. It is only when the body becomes stationary or when contrasting to very specific facts can valid conclusions as to the location of the shooter be made from the wound path within the body.

### d. Documentation and collection of evidence by B.P.D.

The Boston Police Department responded to the scene almost immediately. They secured the scene and the Crime Scene Response Unit photographed, measured and collected evidence from the scene. The inventory of materials collected was comprehensive and leads me to believe that all possible evidence was collected.

The investigation revealed 6 fired cartridge casings located on and near the side walk to the east of the column at 1042/44. The six fired cartridge casings were all 9 mm in caliber and were fired from the same unknown weapon based upon the testimony of Detective Camper.

An analysis of the crime scene measurements and diagram of Officer Moy *(exhibit 4)*, along with the photos of the shell casings at the crime scene *(attached as exhibit 6)*, shows that the fired cartridge casings are all found to the east and north of the column. Measuring from the southeast point of the column, Officer Moy determined the shell casings ranged from 10 feet 1 inch to 22 feet 5 inches from the column. A review of the photographs in *exhibit 6* provides visual context of the location of the shell casings in comparison to the location of the column.

### Review and Analysis of Evidence

**Ejection Pattern**

When a semi-automatic firearm is fired, the pressure of the recoil of the fired cartridge forces the slide of the gun to open and the fired cartridge case is extracted and ejected. Ejection pattern analysis to determine the location of the firearm and shooter also has very limited application due to a number of factors which can effect the distribution of the expended

cartridge cases. These factors include: a) the specific make and model of firearm; b) the caliber; c) the surface deposited on; and d) the method of hand hold which yields the orientation of the ejection port. In this case the only information known is the caliber being a 9 mm. However, and in this specific factual instance, what assists in narrowing down the possible location of the firearm and the shooter, is the presence of a concrete barrier at the scene. This barrier which is full height and impenetrable by cartridge cases permits some interpretation as to the location of the shooter. Meaning, and where all the ejected cartridge casings were found "East" of the barrier, the location of the firearm and thus the shooter must also have been East, as placing the firearm/shooter "West" of the barrier would have necessarily effected cartridge case distribution to appear "West" of the barrier, as this same obstruction ("barrier") would have prevented ejected cartridge casings to permeate through it, causing the casings to bounce off the same, reversing direction from "East" to "West".

As such, and in terms of reconstruction analysis, what makes this case rather unique is the presence of a concrete barrier at the scene. When considering all of the possible permutations of the aforementioned factors, which effect cartridge case distribution, none of them would yield the location of the firearm and shooter on the West side of the concrete barrier where Mr. Russ was located before the fatal shot was fired. *I can state within a reasonable degree of scientific certainty that the firearm's ejection port was on the East side of the concrete barrier when the six shots were fired.*

**Projectile Recovery and Impact Mark Documentation**

Despite a thorough crime scene documentation by the Boston Police Department, no intact projectiles were recovered. Bullet fragments found in Mr. Russ' right calf were unsuitable for comparison purposes. The absence of projectiles or additional fragments combined with the

absence of bullet impact marks on the concrete sidewalk indicate Mr. Russ was not shot after falling to the ground. This is further supported by the combination of Dr. Springer's conclusion that the gun shot wound to Mr. Russ' left thigh is back to front, and the video evidence which does not show a shooter in the area behind Mr. Russ' body after he falls.

**Timing of the Shots**

The time required to fire six shots from a semi-automatic pistol varies with the caliber of the firearm, the type of ammunition, and the skill of the shooter. What is relevant to the analysis and reconstruction of this event is that we know that the fatal shot appears to be one of the first three shots fired, and that the fatal shot took place in under one second. This conclusion derives from the images obtained from the surveillance video, which depict Mr. Russ on the ground and bleeding from the wound to his head within the one second time frame.

**Factual Evidence Summary**

- The victim was shot and killed in the one second between 2:18:02 and 2:18:03;

- Three shots impacted the victim; One to the head, one to the left thigh, and one to the right calf;

- The victim was rendered incapacitated by the shot to his head which occurred within the one second time frame;

- For the fatal shot to the head, the muzzle of the gun was a maximum of 36 inches away from the victim;

- Mr. Yarde's location at 2:18:02 was at the Southwest (building) side of the column; *See exhibit 2.*

- The victim's location at 2:18:02 was at the Northwest (street) side of the column, and facing towards the building; *See exhibit 2.*

- At 2:18:03 the victim's body falls to the West side of the column, with his head resting 6 feet 7 inches from the column, and the victim is 5 feet 7 inches tall. *See exhibit 4 (Moy's sketch), exhibit 7 – crime scene photo, and exhibit 8 (excerpt from autopsy report detailing Mr. Russ' height).*

- The cartridge casings are all found East side of the column (also North of the column as well) indicating the firearm was discharged on this side of the column; *See exhibits 4, 6.*

- Bullet impact marks were not present at the scene.

Based upon these facts and observations, as indicated at the outset of this report, I have been requested to determine whether: 1) Mr. Yarde could have been the shooter in his last known position (west of the column, and closest to the column's most southern point (building side) – and if not possible, in the alternative; 2) determine whether Mr. Yarde could have moved to a different location, where he could have been the shooter based upon the evidentiary materials provided to me.

In order to answer the first question, I am only directed under the guise of the location of the respective parties (Yarde and Russ) at their last observed moment in time, prior to the camera angle panning away.  If the last known location of both parties renders Mr. Yarde as not being the shooter, only then do I move onto the second part of the inquiry.

***Shooting Mr. Russ from Mr. Yarde's last known position;***

As already determined in the "Factual Evidence Summary", the victim was shot and killed in the one second between 2:18:02 and 2:18:03, and the last known location of the victim at the most North Western corner (street) side of the column with him facing towards the building, and David Yarde's last location, was at the most South Western corner (building) side of the column, facing the street (in the direction of the victim).  Assuming that both parties did not move within the split second before shots rang out, Mr. Yarde had a visual of the alleged victim, and if he was holding a firearm, he could have raised his hand up with the muzzle of the weapon "plausibly" being 36 inches away from Mr. Russ' face, and began to fire.  However, the ballistics' evidence in this case would immediately reject this hypothesis.  In any of the various

possible directions that the cartridge cases could have been ejected being left, right, straight up, down, or any variation of this would have yielded the ejected cartridge casings on the West side of the column, and in positions inconsistent with the actual locations where they were found on Officer Moy's crime scene sketch.   This finding alone renders this hypothesis "impossible", without even consideration of the trajectory of the entry and exit wounds into Mr. Russ.

*Mr. Yarde moving from his last known position, and with a firearm 36 inches from Mr. Russ, being able to shoot Mr. Russ three times in under a second;*

*Introduction*

Since my analysis has necessarily excluded Mr. Yarde from being the shooter from his last known position, it is necessary for me to move onto the second part of this analysis – determining whether he could move from his last known position, to some other, and inflict the fatal shot.  When addressing the answer to this second question, while I am working with unknowns with respect to exact locations at the time of the fatal shot, I still have guidance with respect to the exclusion of certain locations and limitations with respect to time.  For example, we know that the shooter had to have been East of the Column, and the muzzle of any weapon which he held to be within 36 inches of Mr. Russ.  Furthermore, and as an additional control factor, the shooting of at least the first three shots had to have occurred in under one second.  Thus, and in a more precise manner, the second question requires the analysis of whether (and in terms of time) Yarde could have moved to a location with his weapon at least 36 inches away from Mr. Russ, (and in under one second), where he could have been the shooter.

**a.  At the time of the shooting, while the shooter would be "East" of the column, Mr. Russ' position would still be "West" of the column.**

As aforementioned, due to the mobility of the human body and the numerous ways it can articulate and rotate, the various positions that Mr. Russ could have been at the time the fatal shot

was inflicted would be approaching the infinite. Furthermore, entry and exit wounds only become helpful if the body becomes stationary or when contrasting to very specific facts can valid conclusions as to the location of the Mr. Russ' body. However, and while I am not able to state the exact positioning of Mr. Russ' body at the time he was shot, I can render an opinion regarding the general placement of his body in relationship to the column. The crime scene diagram indicates the victim's head was found approximately 6 feet 7 inches to the "West" of the column, and where he is approximately 5 foot 7 inches, and where his body was not fully extended. Further, Dr. Laposata rendered an opinion which indicates that when the fatal blow was administered, it would have caused Mr. Russ to be immediately incapacitated and fall. Based upon the location of Mr. Russ at rest, with his head approximately six feet seven inches to the "West" of the column, along with Dr. Laposata's opinion stating that he fell immediately upon being shot, renders me confident in my opinion that Mr. Russ was positioned to the West of the column when he was shot.

Further, not only would Mr. Russ be positioned West of the column, but, and as already explained, Mr. Russ' assailant would have necessarily been "East" of the column at the time the first three rounds were fired. Since Mr. Yarde was also "West" of the column at his last known position, for him to be the shooter, he would therefore be required to position himself: a) "East" of the column; and then b) move further in a northern and easternly direction, so as to have visual access to Mr. Russ and shoot him while Mr. Russ was positioned "West" of the column (*See exhibit 9 - diagram depicting path of travel*).[2]

---

[2] *Exhibit 9* is a sketch drawing for demonstrative purposes. It does not purport to isolate the exact location of the shooter. However, what exhibit 9 does is reveal the difficulty a person would have shooting Mr. Russ from Mr. Yarde's last known position on the "West" side of the column, having to therefore move to a position East and North from that last known position, and position oneself at an angle, where visual access is once again obtained of Mr. Russ.

b.   **Mr. Yarde must move to a position North and East of his last known position, with being within a 36 inch radius of Mr. Russ, as he is standing West of the Column, in order for him to be the shooter.**

As previously opined, Mr. Yarde could NOT have been the shooter of Mr. Russ from his last known position – which was West of the column. By way of deduction, if the shooter could not have been West of the column, I opine that the only potential location for the shooter would be to the East side of the column, and within a 36 inch radius of Mr. Russ as he is standing to the West side of the column. The only question to further answer is whether Mr. Yarde could have reached such a location, and fired the three shots in under one second.

### (i)   On Site Documentation

In order to answer this question, on November 16th, 2020 I visited the scene to view, measure, and photographically document the area.   The column appeared unaltered and was measured to confirm its dimensions.   In addition, I obtained measurements to determine the shortest distance the muzzle of the firearm would have to travel from the Southern end of the column to intersect a target which was one foot from the Northern end of the column.   The one foot starting point from the Northern end of the column was conservatively designated since the precise location of Mr. Russ' head at the time it was impacted by the projectile is unknown.   This measurement is conservative due to the fact that the video appears to illustrate a smaller space between the column and Mr. Russ.   A one foot starting point exposes more of a target area which results in a reduction of both time and distance required.   The closer Mr. Russ was to the column, the more obstructed he would become requiring an increase in distance and time to produce the shots.

### (ii)   Recreation from on-site documentation

In order to determine the feasibility of Mr. Yarde moving (north and east) to a location

within 36 inches of Mr. Russ and firing three shots within one second time frame. I conducted

testing using the measurements obtained at the scene. A sixty-inch-long barrier eight inches

thick was constructed and a target was positioned twelve inches from the end of the barrier to the

closest edge of the head shape of the target. The image depicting Mr. Russ' last known position

before the shooting shows the front of his left foot on the concrete expansion joint which runs

perpendicular to the corner of the West side of the column. There is separation of between Mr.

Russ' forehead and the North East side of the column consistent with width of his left foot or

less.

The point of intersection of the location of the potential muzzle at 36 inches with the one-

foot measurement yielded a distance of 40 inches to the Southern end of the column and 12

inches off of east side of the column in order to have the target exposed. The full width of the

cardboard target (17.72") was exposed, this is wider than the thickness of a human torso. The

additional width of target utilized during testing exposes more available target area reducing

target acquisition time and reduces the total time of placing three shots on target. The total height

of the target was five feet seven inches. A large stake was placed in the ground at 36" to ensure

the muzzle to target distance was consistent with the stippling documented on Mr. Russ' body.

The testing was conducted with a shot timer that produces an audible tone to start and

records the total time stopping at the last audible report of the firearm. The timer also records the

time in between shots referred to as "split times". The documentation and video in this matter

did not provide any information related to how Mr. Yarde is alleged to have been carrying a

firearm. The video frame preceding the shooting shows Mr. Yarde's left hand exposed and does

not depict his right hand. Since this information is unknown the testing was conducted with the

firearm already in hand and fully exposed to reduce the total time required to produce three

shots. The act of pulling a firearm from a concealed location would be expected to require additional time in the order of a minimum of a half to a full second or more. The testing was conducted using both a two-hand and single handed hold on the firearm. The starting point was always a single handed hold on the firearm.

The firearm was pointed at the target "point shooting" during discharge, as opposed to using the sights of the firearm "sighted shooting". This approach was taken also to reduce the total time required to fire the three shots. The targets were addressed from the bottom to the top, consistent with the way a semi-automatic firearm recoils which also reduces time. All testing was conducted with a 9 mm caliber semi-automatic pistol.

**(iii)    Results**

Considering Mr. Russ's position at the time before he was shot, Mr. Spencer has asked me to test the feasibility of the muzzle of a gun held by Mr. Yarde moving to a location on the East side of the column and within 36 inches of Mr. Russ, taking into account a one second differential from Mr. Yarde's last known location, which was five feet of the column's most Southwestern point, and where Mr. Russ was located on the North West side of the column. *See exhibit 2.*

A total of three attempts were made to produce three shots on target at the known dimensions from the crime scene. Two attempts were with two hands on the firearm while firing and one attempt firing one handed. The times for two handed grip on the firearm were 1.76 and 1.72 seconds. The time for single handed firing was 1.78 seconds. It is my opinion based upon these results that it would be virtually impossible for a person standing in Mr. Yarde's last known position could: a) travel to a location where Mr. Russ would be visible and within 36 inches; b)

raise a 9 mm caliber semi-automatic pistol; and c) fire three rounds in under one second – which is what would have been necessary as directed by the evidence I have been presented with.

### (iv)   The presence of persons, east of the barrier, but with unknown location and distance to Mr. Russ.

The one factor that could not be accounted for was the presence of a third individual in the area of the North East end of the column. I am aware that trial counsel for Mr. Yarde (Attorney Scully) alleged at trial that Mr. Collins was the shooter and the individual was at the North East end of the column. The identity of the person occupying this space has no relevance from a scientific stand point. All that is known is that in the image isolated by the video expert Mr. Garneau, a person's foot is identified. The person's specific location is unknown and therefore cannot be accounted for in this testing. All that can be stated is that the presence of the individual could have obscured, totally occluded Mr. Russ as a target or present no obstacle at all.   If the individual was in a position to obscure Mr. Russ as a target, however, this would have added to the total time required to acquire Mr. Russ as a target by some other person moving from Mr. Yarde's last known position.   Since the documentation and record lack specificity on this issue the testing could not address this factor.

All of that said, however, I would opine that if there was a person (Collins or otherwise) already stationed in a position North and East from Mr. Yarde's last known position. and particularly if this person had a gun. and was drawn at the time the camera panned away. it is a high probability (if not a certainty) that this person would have had enough time to fire three rounds into Mr. Russ. in under one second.

In order to reach this conclusion – the feasibility of firing three shots from a stationary position in a one second time frame from a position closer to the North and West end where Mr. Russ was last depicted in the video before the camera panned away was tested. The same barrier

dimensions were maintained as in the first test. The only change was the stake indicating the 36"

muzzle to target distance was moved to in front of the target to maintain this distance consistent

with the stippling found on Mr. Russ.  The starting position of the firearm was exposed and

pointed towards the ground and in a two hand hold for stability and reduced time.

The testing yielded times all under a second. My times were .82 and .93 of a second. My

associate a Master level shooter in scenario based action shooting competitions and firearms

instructor, achieved times of .85 and .88 of a second.

### *Conclusion 1*

Relying upon the crime scene diagrams, photographic /video documentation and my own

measurements obtained at the scene; Mr. Yarde could NOT have been the shooter from his last

known position and Mr. Russ' last known position – West of the column, for the reasons stated.

### *Conclusion 2*

Relying upon the crime scene diagrams, photographic documentation, video documentation and

my own measurements obtained at the scene, Mr. Yarde (from his last known position) would

have had to move in a diagonal direction (North and East) to a location where the muzzle of a

firearm would be within 36 inches of Mr. Russ.  Based upon the foregoing facts, information

and testing, and my firearms and forensic training and experience; I opine to a reasonable degree

of scientific certainty that *in a one second time frame, Mr. Yarde could NOT have moved to*

*where the muzzle was within 36 inches of Mr. Russ, and discharged a 9mm semi-automatic*

*pistol three times impacting Mr. Russ.*

### *Conclusion 3*

A stationary shooter with a firearm exposed, standing in front of a target with 36 inches of

separation between the muzzle of the firearm and the target, **CAN** discharge three shots from a

9mm semi-automatic pistol in less than one second.

### *Review and Analysis of Firearms Examination Evidence*

**Cartridge Casings Recovered**

Six cartridge cases were recovered at the scene. All of the cartridge cases were 9 mm in

caliber but were from a variety of manufacturers. Detective Tyrone Camper testified that the

cartridge cases were from 4 different manufacturers, Winchester, Speer, American, and Master.

Detective Camper further testified that all six cartridge cases were fired from the same firearm.

**Projectiles and Fragments Recovered**

The discovery and trial testimony indicates that no intact or full projectiles were recovered

only two fragments from Mr. Russ' right calf. Detective Camper testified that these fragments

were not suitable for comparison purposes.

**Further Testimony of Detective Tyrone Camper**

Detective Camper, based upon my knowledge of his work, is a very knowledgeable and well

respected firearms examiner. His testimony was rather forthright – which is illustrated by his

response to the following question:

Q.    "Now if you have a live round or piece of ammunition that has not been fired in a

weapon, are you able to do much examination with that"

A.    "It all depends on what the request is for the examination of that item. If the item is

believed to have been cycled through a weapon I could examine the live cartridge to see

if it had cycling marks from a particular weapon".

*See exhibit 10 - excerpt from Detective Tyrone Camper's trial testimony.*

Detective Camper further testified that he did not conduct any comparison examinations of the live ammunition from Mr. Collins' home.

## Potential Firearms Analysis Examinations

### A. Cycling Mark Examination

The six recovered cartridge cases recovered at the scene should have been examined to reveal several types of potentially relevant information. The expended cartridge cases from the scene should have been examined and compared to the recovered unfired ammunition from Mr. Collins' home at 3 Oakhurst street. The type of comparative examination outlined in Detective Camper's testimony regarding "cycling marks", could have yielded evidence identifying this ammunition to the same firearm that produced the recovered cartridge cases from the scene. There are several types of tool marks and individual characteristics potentially present on the live ammunition and the six recovered cartridge cases from 1050 Tremont street. The live ammunition and expended cartridge cases should have been examined for extractor marks, ejector marks, ejection port marks and magazine marks produced by cycling through the magazine.

## Bunter Mark Examination

An additional type of examination to identifying the seized live ammunition from Mr. Collins' home and the recovered expended cartridge case from Tremont street as coming from a common source is a microscopic examination for "Bunter" marks. A bunter is a tool that impresses the information, caliber and manufacturer on the headstamp area of the cartridge case. Due to the wear created during the manufacturing and stamping of the cartridge case individual characteristics can be imparted to the cartridge case. Examination of expended cartridge cases and live ammunition is an accepted practice within the firearms examination field. It is usually

of limited relevance due to the large number of cartridge cases that can be produced by a single bunter. In this case it could have exponentially greater importance since there are four different manufacturers. If all four brands of ammunition exhibited individual characteristics from the Bunter marks in common between the expended cartridge cases recovered at Tremont street and the seized ammunition from Mr. Collins' home it would have substantial relevance to establishing a common source (*See Exhibit 10*).

**N.I.B.I.N Examination**

The documents and trial transcripts do not indicate if the cartridge cases recovered at Tremont street were entered into the National Integrated Ballistic Information Network. "N.I.B.I.N." Entry of the information from the microscopic examination of the six cartridge cases could have yielded connections to other incidents and individuals.  Since I was not provided a copy of the Boston Police Firearms Analysis unit's file. I cannot confirm if this information was submitted to N.I.B.I.N.. and if any evidence from any other incident was determined to be from the same firearm used in this case.

***Conclusions Regarding Firearms Examinations***

It is apparent from the trial transcripts and information provided by attorney Spencer that Mr. Yarde's trial counsel was alleging that Mr. Collins was the shooter in this case. Based upon my training and experience in the field of firearms examination I opine that examinations for cycling marks. bunter marks and submission of information to the N.B.I.N. system should have been conducted to corroborate defense counsel's assertion that the perpetrator was Mr. Collins.

Respectfully Submitted on December 3rd. 2020.

18

Pg 1

## Actual Innocence
### Memorandum of Law

David Yarde has petitioned this Honorable Court for a writ of Hebeas Corpus with emphasis on the fact that Im actually Innocent, which allows the reviewing tribunal also to consider the probative force of relevant Evidence that was not availible at trial, these new facts unquestionably establishes MY Innocence to a scientific Certainty. "All truths are easy to understand once they are discovered; the point is to discover them," by Discovering them this Hornorable habeas court will see that these new facts raise sufficient If not overwhelming Doubt about MY Guilt which undermines confidence In the result of the trial without assurance that MY trial was untainted by Constitutional error, MY threshold showing of Innocence would justify a review of the merits of the Constitutional Claims. see schup, 115 S. Ct. at 865. I further state Facts and cite quotes from said Honorable Court. Which Supports Why I should Be Immediatly released."

1.   Criminal Law ₹ Procedure ≯ Hebeas Corpus ≯ Procedural Default ≯ Actual Innocence ₹ Miscarriage of Justice

"A Convicted Prisoner may, notwithstanding any Procedural default, obtain review of his or Her Constitutional claims only If he or she falls within the narrow class of cases Implicating a fundamental miscarriage of Justice."

Criminal Law ₹ Procedure ≯ Hebeas Corpus ≯ Procedural Default ≯ Actual Innocence ₹ Miscarriage of Justice ≯ General Overview

If a habeas petitioner presents evidence of Innocence so strong that a Court cannot have confidence In the outcome of the trial unless the Court is also satisfied that the trial was free of non-harmless

Pg-2

# Actual Innocence
## Memorandum of Law

constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Criminal Law & Procedure > Habeas Corpus > Procedural Default > Actual Innocence & Miscarriage of Justice > General overview

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection

A dire sentence for an innocent person would also not be tolerable under any notion of Due process.

Criminal Law & Procedure > Habeas Corpus > Procedural Default > Actual Innocence & Miscarriage of Justice > General Overview

Actual Innocence does not require Innocence In the broad sense of having led an entirely blameless life.

Criminal Law & Procedure > Habeas Corpus > Procedural Default > Actual Innocence & Miscarriage of Justice Evidence > Scientific Evidence > General Overview

To Be credible, a claim of actual Innocence based on newly Discovered Evidence requires a Petitioner to support his allegations of Constitutional error with new reliable evidence, whether It Be exculpatory scientific evidence, trustworthy eyewitness accounts, or Critical Physical evidence that was not Presented at trial. It is not the district Courts Independent Judgement as to whether reasonable doubt exists that the standard addresses; rather the Standard requires the district Court to make a probabilistic determination about what reasonable, Properly Instructed jurors would do

Pg 3

# Actual Innocence

## Memorandum of Law

Appendix C: Rules Governing section 22.55
Proceedings for the United States District Courts

Rule 10 - Powers of a Magistrate Judge
A Magistrate Judge may perform the duties of a
district Judge under these rules, as authorized
under 28 U.S.C § 636.

28 U.S.C. § 2248 - Return or answer; Conclusiveness
(2)(B) the facts underlying the claim would be sufficient
to establish by clear and Convincing evidence that
but for Constitutional error, no reasonable fact
finder would have found the applicant guilty of
the underlying offense.

28 U.S.C. § 2246 - Evidence; depositions;
affidavits.
    On application for writ of habeas corpus
evidence may be taken orally or by deposition,
or, In the discretion of the Judge, by affidavit.

28 U.S.C. § 2244 - Finality of determination
# (4)(C)
28 U.S.C. § 2241 - Power to grant writ
(C)(3)

Pg4

# Actual Innocence

## Memorandum of Law
### Appendix C: Rules Governing Section 2255

Rule 2- The motion (b) form. The motion must: (3) State the relief requested;
(4) be Printed, Typewritten, or Legibly hand written;
(5) be Signed under penalties of perjury by the movant or by a person authorized to Sign It for the movant

I Declear under penalties of perjury that Im the petitioner, that I have read this petition or had It read to me, and the Imformation In this memorandum IS true and correct I understand that a false Statement of a material fact may serve as the basis for Prosecution for perjury

Date 7, 8, 21                    Signature David Yurke
                                 Brint David Yurke

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                      SUFFOLK SUPERIOR COURT
                                                 DOCKET NO.: 2012-11181

```
                              )
COMMONWEALTH                  )
                              )
                              )
v.                            )
                              )
                              )
DAVID YARDE                   )
                              )
```

### DEFENDANT'S EMERGENCY MOTION & PRELIMINARY MEMORANDUM TO STAY THE EXECUTION OF HIS SENTENCE PENDING DECISION ON HIS MOTION TO RECONSIDER HIS MOTION FOR NEW TRIAL BASED UPON A CHANGE IN CIRCUMSTANCES

### INTRODUCTION

*"All truths are easy to understand once they are discovered;
the point is to discover them."*

*Galileo di Vincenzo Bonaiuti, de Galilei, circa. 1632.*

The quote from this infamous Italian astronomer, physicist, and engineer, has modern day application, for when a proper amount of investigation is performed into the particulars of one man's conviction in the Commonwealth of Massachusetts, we see that his truth has belatedly come to light, and has come forth now with understanding. His truth is that based upon not only science, but also in conjunction with the facts, Mr. David Yarde was wrongfully convicted of second-degree homicide, and deserves a new trial, if not a finding of actual innocence.

NOW COMES David Yarde, who respectfully moves this Honorable Court, pursuant to *Commonwealth v. Charles*, 466 Mass. 63 (2013), to stay the execution of his sentence in the interest of justice pending a decision on his Motion for Reconsideration of his Motion for New Trial – a preliminary version of which is being presented here, as once the Court takes note of

the issue (and without opposition from the Commonwealth) it will be on notice of an active

miscarriage of justice taking place.  As further grounds, Mr. Yarde states the following:

1. Mr. Yarde's case presents "exceptional circumstances" warranting the exercise of this Court's inherent authority to stay the execution of his sentence. Specifically, because Mr. Yarde presents a colorable claim of innocence, "the interests of justice is not served by [his] continued imprisonment." *See Charles*, 466 Mass. at 74.

2. Mr. Yarde's Motion for Reconsideration offers a "reasonable possibility of a successful decision," *Charles*, 466 Mass. at 77, based upon the findings of a crime scene reconstruction expert (enclosed as *exhibit 1*) who has concluded that it is IMPOSSIBLE for Mr. Yarde to have shot the victim in this case.

3. Further, Mr. Yarde poses no danger to others, and faces a grave risk to his health should he remain in prison pending litigation for his Motion for Reconsideration, due to the ongoing and potential "deadly consequences" of the COVID-19 pandemic at Souza Baranowski Correctional facility, where the virus is already spreading. *Commonwealth v. Nash*, SJC-12976 (2020).

4. As such, and in addition that the Defendant can demonstrate his innocence, but the impact of the Covid-19 pandemic inflicted upon incarcerated individuals warrants his immediate release from prison; *CPCS v. Chief Justice of the Trial Court, et al.*, 484 Mass. 431 (2020);

### STATEMENT OF RELEVANT FACTS[1]

This is a case which turns largely upon video evidence collected from security cameras

installed in the lobby, elevator, and exterior of 1050 Tremont Street in Boston (1050 Tremont).[2]

1050 Tremont Street is a multi-level residential apartment building, with retail space on the

ground level.  The building had 16 cameras which were monitored by a security company on the

premises. There were six cameras which monitored the outdoor area where the shooting

occurred, and which are the essential pieces of evidence used at trial.

---

[1] Yarde necessarily relies upon dkt no. 153 – his motion for new trial, and more specifically the factual conveyance as outlined in those pleadings, and the citation to the trial record in support, and incorporates all of the aforementioned by reference herein.

[2] The video footage which is relevant to the instant discussion, while already introduced in other pleadings, Yarde provides another copy here for convenience (as *exhibit 2*) as it is necessarily at the heart of this discussion.

On the night of October 27-28, 2012, three women were hosting a Halloween "after hours" party in a second-floor apartment in the building. The victim, Deandre Russ, was also living in the building where the party was being held, and he was related to one of the women. In addition to the victim and three women, the party was attended by a sizable amount of people. Among those additional people were the defendant Mr. Yarde, and three other men with whom he was acquainted – Jon Collins ("Collins"), Calvin Miranda ("Miranda"), and Victor Lewis ("Lewis").[3]

There is no evidence depicting what happened at the party itself, but witness testimony described a situation that was increasingly tense, as people were asking partygoers where they were from. Based upon this tension, multiple partygoers decided to leave. Among those deciding to leave were the victim, Collins, Miranda, Lewis, and the defendant. Elevator video footage shows the defendant, Miranda, Collins, Lewis, and the victim leaving in the elevator at 3:17 a.m.[4] In the elevator, the victim was getting more intent on ascertaining where people were from and asked the group. There was not much response, except Mr. Yarde saying "Blue Hill Avenue". Once outside the elevator, the victim continued commenting and at one point Lewis heard the victim say "Mission Bitch", and Mr. Yarde saying "it's not like that, I'm from nowhere", clearly trying to diffuse the situation.

After exiting the elevator, video footage panning the outside of 1050 Tremont captures the five individuals walking along a sidewalk in proximity to one another. The individuals

---

[3] As can be seen on the surveillance footage and confirmed via testimony, John Collins was wearing a dark Dallas Cowboys cap and jeans; Calvin Miranda was wearing a yellow and black Boston Bruins hat, and dark jeans; Victor Lewis was wearing a dark Blue Jays baseball cap, a bright blue sweatshirt and blue jeans; and Mr. Yarde a bright white knit hat, beige pullover long sleeve shirt, and black pants.

[4] The time stamp on all the surveillance videos is one hour off; such that the stamp reads 2:17 AM at the time this group left on the elevator. There is no factual dispute concerning this one hour time discrepancy.

3

eventually come to a white pillar/column,[5] and at 3:17:58, Yarde, Collins, and Lewis can be seen

on one end (building side which is south and just due east of the column), all of them facing the

victim who is separated by the column, who can be seen facing the trio at the other end (street

side which is north and) just due "east" of the column.[6] The last footage depicting the locations

of the four men prior to the shooting occurs at 3:18:02. At that time, Yarde can be seen on the

south of the column, where he is due west, and who is facing the victim who is on the north side

of the column, also due west. The entire width of the column separates them almost exactly. Mr.

Victor Lewis can be seen adjacent to Yarde, but on the east side of the column and closer to the

building. As far as the location of Collins, his foot and shadow can be seen just poking out on

the northern side of column, and due east, with the majority of his body positioned behind the

column, and Miranda can be seen east of the column (on the northern side of the column) angling

toward the street. At that moment the surveillance footage switches cameras, demonstrating a

different angle of the area, and therefore the men and column can no longer be seen. However,

at 3:18:03 (one second later), the victim can be seen entering the frame and falling to the ground,

coming to a complete resting place at 3:18:04.

At 3:18:05, a different camera picks up the feed, and the individuals can be seen begin to

run from the scene. Lewis can be seen running closest to the building then crossing over the

sidewalk closer to the bushes. He is in the front of all of the runners. Collins can be seen

running next to the bushes and behind Lewis and in front of Yarde. Mr. Yarde is behind Collins

and Lewis. All three men are within feet and a split second of each other. The fourth individual,

Miranda, can be seen running across the street in a different direction. It is also unclear (at least

---

[5] The column was measured by Officer Coyne to be five feet in length and 9 inches wide/thick.

[6] Upon review of the footage, it is a reasonable inference that Miranda is behind the column at this point.

from the undersigned's perspective) from the video footage whether any of the individuals running away had any objects in their possession.[7]

During investigation, the victim was found to be in possession of a firearm loaded with .380 caliber ammunition, which was determined to have not been fired. Six shell casings were recovered at the scene, ranging from 10 feet to 22 feet in distance from the column, in various and inconspicuous locations.[8] All of the casings were found both north and west of the column.[9] All of the shell casings were found to be .9mm ammunition, and were manufactured by Winchester (1), Speer (1), American Ammunition (1), and Master (3). All six casings were determined to be fired from the same weapon, which was never recovered.

Based upon this evidence, approximately 30 days later, on November 20th, Boston Police arrested and charged Yarde with murdering Deandre Russ. The defendant was found and arrested at 3 Oakhurst St. in Dorchester, which was actually the residence of Mr. Collins (along with his

---

[7] Despite the lack of clarity in the video footage in the undersigned's perspective, homicide Det. William Doogan testified at trial that he could depict a firearm in the defendant's hand as he ran away from the scene. Mr. Yarde not only disputes Doogan's ability to identify a firearm on a video screen, but he also disputes that Detective Doogan is accurate in any event – that Mr. Yarde possessed a gun. Further, he should not have been allowed to provide his lay opinion on what he claims he saw on the footage, as the video "speaks for itself". Appreciating that it is a little late to be quarreling about the lay opinions given by Detective Doogan for the jury to consider, in any event, Doogan did not testify that he ever saw David Yarde shoot Mr. Russ on the day in question, and so his claim of seeing a weapon in Mr. Yarde's hand at some point does not help in any analysis regarding reconstruction of the shooting. Furthermore, his subjective beliefs are impeached in any event, and by the objective science to come.

[8] *See the crime scene sketch drafted by a police officer Moy, where he conducted the measurement analysis – which can be found in Lewis Gordon's report as exhibit 4.* It should be noted that this sketch was not introduced at the trial of the defendant, but the document was provided by the Commonwealth via discovery, and Yarde provides this information for assistance to this court when appreciating the layout of the crime scene. It is also a certainty that trial counsel (Scully) had this document, and would have necessarily had to have familiarized himself and/or relied upon it, when deciding whether an analysis by a firearms expert/crime scene reconstructionist would have been helpful to his defense and which the same analysis has ultimately determined his innocence.

[9] Which can easily be determined based upon the crime scene photos in conjunction with Officer Moy's diagram. See, *crime scene photos of shell casings – which can be found in Lewis Gordon's report as exhibit 6.*

5

family). Tr. 5-64.   It is also noteworthy to mention that Collins was present during the arrest of

the defendant.  Following the arrest, the residence was frozen and a search warrant obtained in

order to search for evidence (cell phone, ballistics, clothing etc.) linking the defendant to the

crime, with no attempt by the Boston Police to also be on a hunt for obtaining evidence which

could implicate other suspects – such as Collins.[10]  Although the Boston Police found no

evidence at 3 Oakhurst linking the defendant to the crime, they did find a number of .9mm

bullets from a drawer in Collins' bedroom, including bullets made by American, Speer, and

Master.  The discovery of a Master bullet is of particular significance, as the ballistic expert for

the Boston Police Tyrone Camper, testified at trial that in his 17 years working on ballistics he

has only seen a Master bullet/cartridge on one other occasion.[11]

     At trial, there was one eyewitness to the shooting which testified, Delando Hawthorne.

At the time of the incident, Mr. Hawthorne lived across the street from 1050 Tremont in a

rooming house.  He testified that at 3:00 a.m. he was out walking his dog and witnessed the

shooting from across Tremont Street. He stated that he heard four or five shots fired in rapid

succession and saw muzzle flashes.  He testified that the muzzle flashes/shooter was on the east

side of the white column. He testified that the shooter was a brown-skinned man, about 5 feet 8

inches tall with a slim build, and was wearing dark clothing and a dark baseball style cap. He

was certain that the shooter was not wearing a white hat.

---

[10] A review of the search warrant demonstrates this non-objective approach into potential suspects. Mr.
Yarde will provide the search warrant in his final motion for new trial.   Again, Mr. Yarde merely
provides this information to rely upon the fact that trial counsel must have been also aware of the Boston
Police's failures into being on a proper search for the truth, and how a crime scene reconstructionist could
have assisted him in that styled defense.

[11] Tr. 6:104-107

Also at trial, the medical examiner Dr. Kimberly Springer testified. She testified that the victim was shot three times, all of which entered and exited the victim's body. The fatal wound entered just above the victim's left eyebrow and exited the back of his head with a left to right, front to back, and slightly upward trajectory. The victim was also shot in his left thigh and right calf. The trajectory of the shot to the thigh was also left to right. Dr. Springer was unable to determine the trajectory of the shot to the calf. Dr. Springer further concluded due to stippling on the defendant's face, the fatal bullet could not have been fired from more than 3.5 feet, and was most likely fired within 3 feet.

At trial, the defendant argued that Collins was the shooter.[12] Further, Collins initially lied to the police claiming that he was not at the party.[13] Moreover, the ammunition found in Collins bedroom was the same as the shell casings found at the scene.[14] Lastly, the trajectory of the bullet (left to right) and location of shell casings suggested the shooter was more likely standing where Collins was purportedly last seen in the surveillance footage as compared to where the defendant was last seen.[15] Trial counsel did not seek any expert review of the evidence, or present expert testimony on behalf of the defendant at trial to suggest that from a forensic perspective, the theories of his defense would have scientific confirmation.

---

[12] In his closing argument, trial counsel states the following:

> "[the eye witness] described the height, weight, skin color, and the hat of the shooter, and the last person in that area was John Collins, matching the height weight, skin color, and pretty much the headwear of the shooter."... How does this guy slip through their fingers? Right?"

Tr. 9:17-22

[13] Tr. 9: 32-33

[14] Tr. 9: 31

[15] Tr. 9: 23-25

## PROCEDURAL POSTURE OF THE CASE TO DATE

In December of 2012, a grand jury sitting in Suffolk County returned two indictments against the defendant, David Yarde ("Yarde"), charging him with first degree murder and unlawfully carrying a firearm. *See Docket Entry No. 1 for 1284CR11181.* The Commonwealth alleged that it was David Yarde (and not Collins or any of the other people seen on the video) who was the person who fatally shot Mr. Deandre Russ outside of 1050 Tremont Street in Boston in the early morning hours of October 28, 2012 .

On or about July 23rd 2014, the case was tried before a jury with the Honorable Judge Kaplan presiding. *Id.* On August 6th 2014, the jury found Yarde guilty of second-degree murder and unlawful possession of a firearm. *Id.* On August 22, 2014, Yarde was sentenced to a sentence of life with the possibility of parole after fifteen years on the second-degree murder charge, and not less than three years nor more than three years and one day on the firearm charge, to be served concurrently. *Id.*

On April 4, 2017, attorney Richard Shea filed a notice of appearance as post-conviction counsel for the defendant in this court. *Id. at dkt entry #120.* Yarde timely appealed his convictions to this Court by filing a notice of appeal on September 18, 2014. *Id. at dkt entry #94.* On December 4, 2017, Yarde moved to vacate his appeal in order to file a motion for a new trial, which was allowed on December 5, 2017. *Id. at dkt entry #128.*

1. **Mr. Yarde terminates Attorney Shea, and also filed *pro-se* motions for a new trial, which contains the report of forensic pathologist Dr. Jonathan Arden.**

On March 27, 2018, the defendant filed various *pro-se* motions which included: 1) a request to dismiss his counsel (Richard Shea); 2) a Rule 30 motion for post-conviction relief; and 3) a supplement to his post-conviction relief motion. *Id. at entries # 132, 133 and 134.* On April 20th 2018, Attorney Shea filed a motion to withdraw as counsel. *Id. at #136.* On that same day,

8

the defendant filed an additional *pro-se* motion for post-conviction relief and a memorandum of law in support. *Id. at #137 and 138.*[16]   However, and since Mr. Yarde was still represented by counsel at the time of his *pro-se* filings, the Court didn't allow the filings until May 14, 2018, which at that time a hearing was also held regarding Attorney Shea's motion to withdraw, which was ALLOWED.[17]

Upon review of Mr. Yarde's *pro-se* pleadings, and in support thereof, Mr. Yarde presented an expert report authored by Dr. Jonathan Arden (a forensic pathologist) of Arden Forensics.[18]   After review of the same, if Dr. Arden were to have been called upon to testify at trial, he would have opined that based upon the trajectory of the gunshot wounds, along with the location of the fired cartridge casings, the firing of the weapon would have been **"inconsistent"** with the defendant's last seen location on the video immediately before the shooting.[19]

2. **After Mr. Yarde's *pro-se* filings and termination of Attorney Shea, he hires new counsel, who thereafter filed a supplement to Yarde's *pro-se* motions, which included another expert, Dr. Elizabeth Laposata.**

The Commonwealth was given until July 20th 2018 to file an opposition and did so on July 23rd 2018. *Id. at #144.*   Prior to a ruling on the filings to date, Mr. Yarde secured the services of new counsel (Mr. Jarret Adams and Mr. Carlton Williams), with their filing of appearances on September 11, 2018.   A status hearing was held on October 18, 2018, at which time Judge Kaplan granted the defendant (via his new counsel) leave to make a supplemental

---

[16] Pleadings 137 and 138 appear to supersede Mr. Yarde's previous pleadings (133 and 134) as Mr. Yarde contends they are a mere magnification of what was originally filed.

[17] *Id.*

[18] Please find Arden's report enclosed as *exhibit 3.*

[19] *See page 15 of Dr. Arden's report – "On the contrary, all of the evidence from the gunshot wounds and casings is consistent with the shooter having approached Mr. Russ from his left. . . and shooting from close range".*

filing, to buttress his already filed motions, and to do so by January 4, 2019. *Id.* On February

01, 2019, pleading #153 was filed – entitled "Motion for New Trial". *Id.*[20]  In this final pleading,

Yarde argued that trial counsel provided him with ineffective assistance for failing to call an

expert pathologist, failing to cross-examine the medical examiner at all, as well as his failing to

retain a video expert.[21]   On the issue of trial counsel's failure to call a pathologist, post-

conviction counsel found a pathologist of his own, Dr. Elizabeth Laposata, who opined, to a

reasonable degree of medical certainty, that:

> "[i]t is *impossible* for the shots to have originated from
> Mr. Yarde's position [seen in the surveillance video]".

*See page 2 of Dr. Lapasota's report, in Dkt. 153.*

Dr. Laposata reached this opinion based upon a trajectory analysis/argument.  In essence, she

found that the shots which impacted the victim had to have come from his left side (as also

opined by Dr. Arden), extrapolating that location from: a) analysis of the location of the shell

casings which had laid to rest; b) the bullets entering the left side of the victim's body; and c) the

testimony from witness/Hawthorne, stating that the shooter ejected his weapon from the east side

of the pillar (or the left of Mr. Russ).  Since Mr. Yarde from his last known position was not to

the left of Mr. Russ, but actually to his right, she rendered it an "impossib[ility]" that he was the

shooter.

3. **Judge Mitchell Kaplan, and after oral argument on the pleadings filed to date, made
   error in his assessment of Dr. Laposata's report, and DENIED Mr. Yarde relief.**

---

[20] Although the title of the pleading was named "First Motion for New Trial", by all accounts it should
have been perceived as a supplemental filing to Mr. Yarde's original *pro-se* motions. Indeed, and on page
3 of this supplemental filing (#153) Yarde's lawyers acknowledged that it was merely supplemental,
thereby, and by inference, incorporating by reference Mr. Yarde's original filings.

[21] The defendant did not include an affidavit from his trial counsel Liam Scully, explaining why he didn't,
but will provide an affidavit (either from Attorney Scully or the undersigned outlining his position) in the
Defendant's final submission.

On October 27th 2019, Judge Kaplan called the parties into court for oral argument on

Mr. Yarde's Motion for New Trial.  Upon review of the recorded hearings, counsel for Yarde

argued not only the findings made in Dr. Laposata's report – that it was impossible for Mr.

Yarde to have shot the victim from his last known position, but also argued that it was

impossible for Mr. Yarde to have traveled to any other location and shot Mr. Russ as well.[22]

Judge Kaplan's response to these arguments was effectively dismissive.  The staunchness

of this attitude can not only be fleshed out upon a review of his written findings (*dkt entry no.*

*164*), but also from a review of the hearing minutes itself.  What follows is what Mr. Yarde

gathers from review of the aforementioned:

1) Judge Kaplan rejected Dr. Laposata's ultimate opinion, which rendered the shooting
   as an "impossibility" from Mr. Yarde's last known position, as Judge Kaplan believed
   that it was not within her range of expertise to make such a finding.  The thought
   process behind this rejection is that although Mr. Yarde's last position can be seen on
   the camera, once the camera pans away, his exact positioning at the time of the
   shooting is unknown.  Once the camera panned away, Judge Kaplan believed it was
   "possible" that Mr. Russ could have positioned his body at an angle, all the while still
   facing Yarde head on, but with his body slightly turned and exposing his left side to
   Mr. Yarde.

2) Upon consideration of the aforementioned positioning, Judge Kaplan suggested that
   Mr. Yarde could have shot a weapon which entered Mr. Russ' left side, but while Mr.
   Yarde's physical body was still standing to the right of him – calling the positioning
   of both parties an "obvious possibility".

3) To explain this even further, Judge Kaplan believed that so long as Mr. Yarde's arm
   was within 3 feet away from Mr. Russ, and from the aforementioned positioning, Mr.
   Yarde still would have been within the 3 feet required of the stippling, and therefore
   within the range of firing the fatal shot.

---

[22] Upon review of the oral argument, we see Attorney Carlton Williams state that in a period of .75
seconds, Mr. Yarde would have to run, raise a firearm,  fire it, and would have to hit Mr. Russ and Mr.
Russ would have to begin falling, suggesting that would seem "impossible".

On January 8th 2020, and for the reasons stated above, Judge Kaplan DENIED the

motion. *See dkt. entry 164.* In providing further findings, Judge Kaplan also found Dr.

Laposata's testimony (in other respects) consistent with what the Commonwealth's expert (Dr.

Springer), had already testified before the jury.   As a result, and therefore, Dr. Laposata's

testimony would not have impeached Dr. Springer, who in any event was not called to evaluate

areas of crime scene reconstruction, but rather cause of death and trajectory of the entry and exit

wounds.   As a result, Judge Kaplan found that trial counsel's failure to cross-examine Dr.

Springer, did not demonstrate "what [if any] additional evidence of value could have been

obtained by cross-examining Dr. Spinger".  Finally, and regarding trial counsel's failure to retain

a video expert, Judge Kaplan found that the expert's "affidavit and report does not provide any

additional visual evidence beyond that presented at trial."

### a.  Mr. Yarde submits that Judge Kaplan was in error about one aspect of his findings.

Mr. Yarde has no quarrel with Judge Kaplan's findings as it pertains to trial counsel's

failure to cross-examine Dr. Springer, or with trial counsel's failure to retain a video expert.

However, and as will be seen shortly, Judge Kaplan's thought process on Dr. Laposata's opinion

about it being impossible for Mr. Yarde to have committed this shooting from his last known

position was ill-conceived.   To state this simply, Judge Kaplan debunked Dr. Laposata's

"impossibility" opinion by creating a "possibility" scenario of his own – that it was an "obvious

possibility" that Mr. Yarde and the victim from their last known positions could have been

placed at an angle which would have allowed Mr. Yarde to have shot him.   This was error.

What Judge Kaplan misunderstood, and will be shown *infra*,  is that no matter how Mr. Yarde

and the victim were last positioned, the column (or the barrier) in this case would render it

IMPOSSIBLE for Mr. Yarde to have committed the shooting from that location.  Furthermore,

12

and equally as significant, it is conclusive that Mr. Yarde could not have gotten to a position to be able to shoot Mr. Russ (stippling distance of 3 feet) within a one second period of time.[23]

To this end, and after Mr. Yarde has reviewed Judge Kaplan's findings, and with the utmost deference to Judge Kaplan, but feeling suspicious about whether Judge Kaplan had the requisite expertise to make such opinions, Yarde consulted with a crime scene reconstructionist (Mr. Lewis Gordon), whereupon a discovery has been made which serves to negate any ill-conceived speculation and establishes TRUTH of the matter asserted by Dr. Laposata – that Mr. Yarde could NOT have been the shooter in this case, from his last known position, nor any other position in a less than one second period of time.

4.  **Mr. Yarde has consulted with a crime scene reconstructionist, which demonstrated that Mr. Yarde could not have been the shooter from his last location, no matter how he or the victim were positioned once the camera has panned away, as Judge Kaplan has theorized, and as well also found it impossible for Mr. Yarde to have traveled to any location where he could have been the shooter (as argued by post-conviction trial counsel) as he was limited by less than a second to do so.**

a.  **Yarde could not have been the shooter from his last location.**

Upon review of Mr. Gordon's report,[24] he found it is impossible that Mr. Yarde could have been the shooter from his last known location (at the southern portion of the column, and due west, facing the victim), and the victim's last location (at the northern portion of the column, also due west, and facing Mr. Yarde) as the ballistics evidence alone would immediately reject that hypothesis. Mr. Gordon opined that if Mr. Yarde had been holding a firearm with the muzzle within thirty-six inches of the victim, the firearm would have been parallel to the column,

---

[23] Counsel for Yarde argued this latter point, but had no scientific evidence to support it. In any event, Judge Kaplan did not even address this additional point in his findings, most likely because he found it moot – as he found it "obviously possible" that Mr. Yarde could have shot Mr. Russ from his last known position.

[24] Upon review of the same, we must necessarily come to see Galileo's quote at the beginning of this pleading take form – which is once the truth is finally discovered, it is easy to understand.

13

and if the shell casings were ejected to the right they would have necessarily hit and bounced off the column landing on the **west** side of the column – an outcome which is at odds with the evidence in this case (the shell casings being found at rest **east** of the column). In essence, it's the column which serves as the difference maker in the analysis, and therefore and as the circumstances would have it, it is the barrier (alone) which renders it a certain "IMPOSSIBILITY" for Mr. Yarde to have shot Mr. Russ from their respective last known positions and with no room for variance (as Judge Kaplan has theorized). Thus, the trajectory of the entry and exit wounds, nor the exact positioning of Mr. Yarde or Mr. Russ on the **west** side of the column has any relevance or import in this specific discussion.

### b. Yarde could not have been the shooter moving from his last location, to another, within one second.

As a result, and after Mr. Gordon eliminated the aforementioned hypothetical approach for attaching criminal responsibility to Mr. Yarde, he appreciated that the only possible area from where Mr. Yarde could have been the shooter, was for him to travel from the **west** side of the column over to the **east** side, and thereafter locate Mr. Russ and shoot him, who still must be standing on the west side of the column. Mr. Gordon's rationale for concluding that Mr. Russ was still standing on the west side of the column at the time he was shot is determined from his opinion that Mr. Russ' last known position was west of the column, and then upon him being shot within one second's time, the fatal blow would necessarily cause his body to immediately drop, and where his body was seen laid to final rest, also due west of the column.[25]

Therefore, and after appreciating that Mr. Russ was standing on the west side of the column at the moment he was shot, Mr. Yarde would therefore have to travel from his last

---

[25] Mr. Gordon's observation that Mr. Russ fell immediately upon being shot actually comes from an opinion made by Dr. Laposata, but Mr. Yarde does not believe it is in dispute. *See page 2 of Dr. Lapasota's report, in Dkt. 153.*

known position which was also due west of the column, and thereafter find Mr. Russ, whereupon he would also have to draw a firearm from wherever he kept one (as there is no firearm seen in the defendant's hand in the second before Mr. Russ was shot) and thereafter eject numerous shots, with the fatal shot entering into the face of Mr. Russ, and do all of this in less than one second's time, as the camera footage has only allotted this brief window upon which to do it – an opinion rendered by Mr. Gordon as also being IMPOSSIBLE.

c. Mr. Gordon reconstructs the crime scene to come to his opinion.

To be sure of this impossibility, Mr. Gordon reconstructed the crime scene with the aim of determining how long it would take for a person to go from Mr. Yarde's last known location (due west of the Column) and travel to within a shooting angle (east of the Column), and far enough so that the column does not serve as an obstruction to a visual of Mr. Russ, who remained on the west side of the column. Furthermore, Mr. Yarde would not only have to travel to this east side of the column, but he would also have to be within 36 inches of Mr. Russ at the time he shoots. Mr. Gordon also undertook this analysis with the most conservative of parameters – creating the most efficient and direct route of travel, so as to create optimal certainty in his conclusions – as it was necessary to determine if under any scenario, Mr. Yarde could have accomplished this crime. Therefore, and in order to analyze this hypothesis with certainty, Mr. Gordon also utilized the services of an expert marksman, so as to create the smallest window of time for a person of his skill to have accomplished this feat from his last known position – attempting to see if it can be done – appreciating that most likely Mr. Yarde could not even do it with such efficiency. In essence, this expert marksman is merely trying to ascertain if it can be done.[26]

---

[26] For example, if the feat could be done – meaning shoot Mr. Russ in under one second's time, Yarde would therefore lose the argument that he didn't have the time to perform the act himself – unless of

After reconstruction, Mr. Gordon's results opined that the fastest time that a trained shooter would be able to travel from Mr. Yarde's last known location, and to a shooting angle to hit Mr. Russ would have been 1.72 seconds.   Where the shooting of Mr. Russ took place in under a second, this outcome therefore renders it IMPOSSIBLE for Mr. Yarde to have been the shooter in this case.[27]   As a result, and not only is there serious doubt that a jury would render the same verdict with this new expert analysis, thus deserving Mr. Yarde a new trial, but Mr. Gordon's report (unless rebutted by the Commonwealth) actually demonstrates that Mr. Yarde is INNOCENT.

In light of all of the above, the Defendant submits that Judge Kaplan's opinion, about "obvious possibilities" is no more.   What is left is only a "substantial risk" that had Mr. Gordon's testimony been presented at trial, the outcome of the trial would have been different – a Not Guilty Verdict because Mr. Yarde is INNOCENT.

---

course he were to argue that an expert marksman could surely draw his gun and shoot it faster than he could.  However, that type of argument is actually moot, because as it turns out, even an expert marksman could NOT perform the shooting in under a second.   Yarde expects the Commonwealth to argue well, "why couldn't Yarde shoot a gun faster than an expert's marksman"?  If the Commonwealth even squeaks out a question like that in their opposition, not only do they have any evidence to support that the answer to that question is in the affirmative, they must also concede that they have lost this battle, because that would suggest that these arguments need to be made to a jury and not a Court.

[27] As the facts would also have it, Mr. Gordon's findings also squarely points to another person located at the crime scene where it was more than possible for him to have committed this crime.  It should come as no surprise that this person is Mr. John Collins – the person who not only lied about being at the crime scene, and the person who was not only found in possession of the same type of ammunition which was used to kill Mr. Russ, but who by all accounts was closer to the alleged victim, and the shell casings which came to rest after Mr. Russ was shot.  This memo is not an indictment of Mr. Collins – as that is the Commonwealth's modus operandi in seeking justice for victims.  One could call this memo an indictment of the Commonwealth however, for not considering any reconstructive practice in this crime scene, which appears to demand it, in light of the missing footage.

## **DEFENDANT'S PRESENT POSITION – A CHANGE IN CIRCUMSTANCES**

To flesh this out again, as Yarde perceives that it will be a new judge who will pick up the baton from Judge Kaplan,[28] and where this analysis requires an intimate understanding of the intricacies and nuances of this case, there is no question that Judge Kaplan believed that in spite of Dr. Laposata's opinion, that it could still be "possible" that Mr. Yarde was the shooter, by merely placing the parties face to face on one side of the barrier, and with some shifting of the positioning of their specific bodies.   Judge Kaplan was left to his own thought process on this point, because he (as well as a jury) lacked the information which was needed to properly assess this crime scene.  Judge Kaplan has never been given a report from a crime scene reconstructionist, and thus his opinion was based upon the limited information upon which he was provided,  and therefore he had nothing in front of him but a wide door for speculation to . enter, and thus create a path which would still inculpate Mr. Yarde.

Upon review of Judge Kaplan's opinion, and to be frank, without any disrespect to the Court, Mr. Yarde believed that just as Judge Kaplan thought Dr. Laposata's opinion was outside her range of expertise, Judge Kaplan may not have the requisite expertise either to make such opinions.  As such, the Defendant has consulted with an expert which not only should have been consulted by trial counsel, but post-conviction counsel as well, and presented not only to the jury, but at this juncture to this Court, so as to remove any speculative theory from the analysis, and which serves to demonstrate that Judge Kaplan was unwittingly in error.  The expert which Mr. Yarde has consulted was a crime scene reconstructionist, and as can be seen from his report, his opinions have given meaning to the quote by *Galileo*, deposited at the beginning of this pleading, and we have now finally discovered the truth in this case.   This discovery Yarde would submit amounts to a change in circumstance where justice would require a second look.

---

[28] To the undersigned's understanding, Judge Kaplan entered retirement in 2020.

## ARGUMENT

Pursuant to *Commonwealth v. Charles*, 466 Mass. 63 (2013), whether to allow a defendant's motion to permit to bail while his new trial motion is pending for disposition, the court outlined two factors, 1) whether the defendant's motion for new trial has a reasonable possibility of success, and b) whether the defendant poses a security risk, if released. *Id.* at 77. The two considerations relevant on whether to grant a stay of execution of a sentence pending the disposition of a motion for a new trial "are the same as those relating to a stay of execution of sentence pending appeal." *Charles,* 466 Mass. 63, 77. Currently, there is also a third factor to be considered when deciding whether to stay a defendant's sentence pending appeal. *Commonwealth v. Nash*, SJC-12976 (2020). The "potentially deadly consequences" of COVID-19. *Id.* This third factor only comes into play, if the defendant fails under the "traditional two-factor test". *Id.*

### Prong One – Reasonable possibility of success

Success "…does not need to be certain or even more likely than not.*" Commonwealth v. Nash*, SJC-12976 (2020). "[T]he burden on the defendant to establish the requisite possibility of success is not onerous; yet the defendant must show that there is at least one appellate issue of sufficient heft…" such that it would require the court to give it "legitimate evaluation", and "if successful, lead to a favorable outcome for the defendant. *Id.* Embodied within [the first] inquiry is the primary motivation for granting stays: if the motion is successful, absent a stay, a fundamental injustice could have occurred." *Garcia v. Commonwealth*, No. SJC-12749, (2020); *See also Commonwealth v. Levin*, 7 Mass. App. Ct. 501, 513 (1979) ("The conviction may be reversible, but the time spent in prison is not.").

In the instant matter, Mr. Yarde has a remarkably strong chance of success on his

pending rule 30 motion. This is merely due to the aforementioned – that it was physically

impossible for him to have been the one who fired the fatal shot that killed the deceased in this

matter. Crime Scene Reconstructionist Lewis Gordon examined the record and concluded:

> "Mr. Yarde could NOT have been the shooter from his last known
> position and Mr. Russ' last known position…[and] in a one second
> time frame, Mr. Yarde could not have moved to where the muzzle
> was within 36 inches of Mr. Russ, and discharged a 9mm semi-automatic
> pistol three times impacting Mr. Russ."

*Exhibit 1, at p. 15.*

Based on these facts, and unless the Commonwealth can demonstrate otherwise, and even if so,

this is a question of acceptance or rejection by the jury, there is a reasonable possibility that Mr.

Yarde will have success on his appeal/Rule 30 motion.

## Prong Two – Is the Defendant a safety risk?

Regarding the second consideration, whether the defendant poses a security risk, the

court takes into account whether the defendant will return to court, whether the defendant poses a

danger to anyone or the community, and the likelihood that the defendant will commit other

crimes while a resolution of the motion for a new trial is pending. *Charles,* 466 Mass. At 77,

citing *Polk v. Commonwealth,* 461 Mass. 251, 253 (2012). Moreover, to the undersigned's belief,

the Defendant has only one conviction on his record – a firearm conviction for an offense dating

back to 2010. Furthermore, if this Court agrees with the Defendant, that his innocence has been

demonstrated, then he presents no more risk to anybody then any other person wrongfully

charged with murder. Furthermore, if the Defendant is released, he will seek to reside in the

city, and will provide the address and particulars to the Court *in camera.*

19

**Prong Three – COVID-19**

"A judge should not, however, use the absence of or a reduction in the number of outbreaks of the virus when determining the general risk to a defendant. *Nash, supra.* "That an individual defendant is not known to be at particularly high risk from the dangers of COVID-19 should not be taken as a reason to deny a stay." *Id.*

## CONCLUSION

In conclusion, the pending motion that is before this court is not for purpose of delay, and raises a substantial question of law and facts and will likely result in reversal of the defendant's convictions, the defendant does not pose a risk to any individuals or the community, and the COVID-19 presents a health risk to the defendant which is difficult to avoid while incarcerated. This motion should therefore be allowed.[29]

<div style="text-align: right">

DAVID YARDE,
By his Attorney,

Gordon W. Spencer, Esq.
BBO# 630488
945 Concord Street
Framingham, MA 01701
(508) 231-4822

</div>

---

[29] As an additional note. based upon the strong evidence presented in the expert's report, the Supreme Judicial Court Rules of Professional Conduct Rule 3.8(J): Special responsibilities of a prosecutor state the following:

"When a prosecutor knows that clear and convincing evidence establishes that a defendant, in a case prosecuted by that prosecutor's office, was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the injustice."

COMMONWEALTH OF MASSACHUSETTS
The Trial Court Department

SUFFOLK, ss.                                    SUPERIOR COURT
                                                NO. 1284CR11181

COMMONWEALTH OF MASSACHUSETTS

v.

DAVID YARDE
Defendant.

**COMMONWEALTH'S OPPOSITION TO THE DEFENDANT'S
EMERGENCY MOTION TO STAY THE EXECUTION OF HIS
SENTENCE PENDING DECISION ON HIS MOTION TO RECONSIDER
HIS MOTION FOR NEW TRIAL**

Now comes the Commonwealth in the above-captioned matter and respectfully requests that this Honorable Court deny the defendant's motion to stay the execution of his sentence, and deny his motion to reconsider the denial of his motion for a new trial. A stay of the execution of the defendant's sentence is inappropriate because he is a flight risk and a danger to the community. His motion for reconsideration – filed over a year after the decision on his motion for a new trial and nearly sixth months after the judge who decided the motion (Kaplan, J.) retired from the bench – is untimely and meritless. Accordingly, the defendant's motions should be denied.

## PRIOR PROCEEDINGS

On December 19, 2012, a Suffolk County grand jury returned indictments charging the defendant, David Yarde, with first degree murder, in violation of

G.L. c. 265, § 1 (count 1); and possession of a firearm without a license, in violation of G.L. c. 269, § 10(a) (count 2) (Ex. A pp. 1-4). [1]

On November 5, 2013, the defendant filed a motion to dismiss, and on November 8, 2013, he filed a motion to suppress evidence (Ex. A p. 6). A hearing was held on the defendant's motions on December 17, 2013, and his motions were denied on December 20, 2013 (Fahey, J.) (Ex. A p. 7).

From July 23, 2014, through August 6, 2014, the defendant was tried by a jury before the Honorable Mitchell H. Kaplan (Ex. A pp. 7-11; Tr. 1:1; 10:1). On August 6, 2014, the defendant was convicted of second degree murder and unlawful possession of a firearm (Ex. A p. 11; Tr. 10:19). On August 22, 2014, he was sentenced to life in prison with the possibility of parole after fifteen years on the murder charge, and to not less than three years and not more than three years and one day on the firearm charge, to run concurrently with the sentence on the murder charge (Ex. A p. 11; Sent. 17-18).

The defendant filed a timely notice of appeal, and his case was entered in the Appeals Court on February 4, 2015 (Ex. A p. 12). [2] His second post-

---

[1] For the Court's convenience, a copy of the Superior Court docket sheets for this matter is attached hereto as Exhibit A, and a copy of Judge Kaplan's memorandum of decision and order on the defendant's motion for a new trial is attached hereto as Exhibit B. The trial transcript will be cited by volume and page number as (Tr. [volume]:[page]), and the transcript from the sentencing hearing will be cited as (Sent. [page]). The defendant's motion for a new trial will be cited as (D.Mtn. [page]). His pending emergency motion & preliminary memorandum to stay the execution of his sentence pending decision on his motion to reconsider his motion for a new trial based upon a change in circumstances will be cited as (D.Pend.Mtn. [page]).

conviction counsel, Robert L. Sheketoff, filed an appellate brief on May 3, 2016,

but on August 15, 2016, Attorney Sheketoff moved to withdraw as counsel, and

his motion was allowed the following day. (*See* Appeals Court Docket  at

https://www.ma-appellatecourts.org/docket/2015-P-0161).[3]  On April 4, 2017,

Attorney Richard Shea filed a notice of appearance as post-conviction counsel for

the defendant in this Court (Ex. A p. 14).  On December 4, 2017, Attorney Shea

filed a motion to vacate the defendant's appeal without prejudice so that he could

pursue a motion for a new trial, and his motion was allowed on December 12,

2017 (Ex. A p. 15).[4]

On March 27, 2018, the defendant filed (in this Court) a:  (1) pro-se

motion to dismiss counsel (Paper #132); (2) pro se motion for post-conviction

relief (Paper #133); (3) supplement to attachment to post-conviction relief motion

(Paper #134); and (4) motion seeking copies of various papers (Paper #135) (Ex.

A p. 15).

On April 20, 2018, Attorney Shea filed a motion to withdraw as counsel

(Paper #136) (Ex. A p. 16).  The same day, the defendant filed a:  (1) pro se

---

[2] The defendant has made numerous post-conviction filings both pro se and through counsel (Ex. A p. 16-20).  The Commonwealth recites only those relevant to the instant motion.

[3] Attorney Leslie O'Brien had previously filed a notice of appearance on behalf of the defendant, but moved to withdraw before filing a brief.  *See* https://www.ma-appellatecourts.org/docket/2015-P-0161.

[4] The defendant's appeal was subsequently re-entered in the Appeals Court (Docket No. 2019-P-0066) (Ex. A p. 18).  Appellate proceedings were stayed to provide the defendant with an opportunity to file his final comprehensive post-conviction motion in this Court (Ex. A p. 18).

4

motion for post-conviction relief "sua ponte" [sic] filed (Paper #137);[5] (2)

memorandum of law in support of his motion (Paper #138); and (3) motion

requesting Judge Kaplan "accept report of consultation without filing with the

Clerk's Office" (Paper #139) (Ex. A p. 16).  On May 14, 2018, a hearing was held

before Judge Kaplan regarding Attorney Shea's motion to withdraw (Ex. A p. 16).

After a thorough colloquy, the defendant was permitted to proceed pro se and

Attorney Shea was permitted to withdraw (Ex. A p. 16).  The Commonwealth was

ordered to respond to the defendant's motion for a new trial by July 20, 2018.

On July 20, 2018, the Commonwealth filed its opposition to the

defendant's motion for a new trial (Ex. A p. 17).  On September 11, 2018, the

defendant's fourth post-conviction attorney, Attorney Jarrett Adams, filed a notice

of appearance on behalf of the defendant, as well as a motion to be admitted *pro*

*hac vice* into the Massachusetts Bar (Ex. A p. 17).  On October 18, 2018, a

hearing was held before Judge Kaplan during which the defendant, represented by

Attorney Adams and Attorney Carlton Williams, requested additional time to

review the record and file an updated motion for a new trial (Ex. A p. 18).  Judge

Kaplan ordered the defendant to file a "supplemental *final and comprehensive*

post trial motion" by January 4, 2019 (Ex. A p. 18) (emphasis added).

On January 4, 2019, the defendant filed a motion to extend the time for the

filing of his motion for a new trial (Ex. A p. 18).  Judge Kaplan allowed the

defendant an additional thirty days in which to file his motion, and provided the

---

[5] Paper #137 was essentially a verbatim copy of Paper #133.

Commonwealth with an additional thirty days in which to file its response (Ex. A p. 18). On February 1, 2019, the defendant filed a new motion for a new trial (Ex. A p. 18; Paper #153). On April 22, 2019, the Commonwealth filed its opposition (Ex. A p. 18; Paper #154).

On October 17, 2019, Judge Kaplan held a non-evidentiary hearing on the defendant's motion (Ex. A p. 19). On January 8, 2020, he issued a memorandum of decision and order denying the defendant's motion (Paper #164; Ex. B). On January 10, 2020, the defendant's appeal (which, as described above, had been stayed pending a decision on the motion for a new trial) was dismissed for lack of prosecution after the defendant failed to file the status reports or to respond to the Court's notice regarding an order of dismissal for lack of prosecution for the defendant's failure to either file a status report or a brief (Ex. A p. 19; *see also* https://www.ma-appellatecourts.org/docket/2019-P-0066). On January 14, 2020, the defendant filed a status report, after which he was informed by the Court that a motion to reinstate the appeal was required before any further filings could be made in the Appeal Court. *See* https://www.ma-appellatecourts.org/docket/2019-P-0066.

On February 10, 2020, the defendant filed a motion for the enlargement of time to file a late notice of appeal from the denial of his motion for a new trial, and on February 12, 2020, his motion was allowed (Ex. A p. 19). To date, the defendant has not filed a notice of appeal or a motion to reinstate his appeal (Ex. A p. 19-20; https://www.ma-appellatecourts.org/docket/2019-P-0066).

On January 20, 2021, over a year after Judge Kaplan denied the

defendant's motion – and nearly six months after Judge Kaplan had retired from

the bench – the defendant, represented by yet another new post-conviction

attorney, filed the present motions (Ex. A p. 20).

## STATEMENT OF FACTS

The following facts were recited by Judge Kaplan in his January 8, 2020,

order denying the defendant's motion for a new trial.

> This is a case that turns largely on video evidence collected
> from security cameras installed in the lobby, elevator, and exterior
> of 1050 Tremont Street in Boston (1050 Tremont). 1050 Tremont
> is a multi-level apartment complex with some retail space on the
> street level. The video evidence establishes the defendant's
> presence, with three other individuals, with the victim at the time
> and place of the shooting. The camera that captures those images
> pans away from the group just before the moment that the victim is
> shot and killed. The video, however, provides graphic evidence
> sufficient for a jury to reach the guilty verdicts that it returned.

> Three women who lived at 1050 Tremont hosted an 'after
> hours' Halloween party on October 27-28, 2012 in an apartment on
> the second floor. The victim was a friend of the hostesses and
> attended the party. An individual named Jalelle was invited to the
> party because one or more of the hostesses knew his mother.
> Jalelle asked several of his acquaintances to accompany him to the
> Halloween party, including, among others: the defendant, who
> was wearing a white or cream colored knit hat; Calvin Miranda,
> who was wearing a yellow and black Boston Bruins knit hat; John
> Collins, who was wearing a Dallas Cowboys hat and jeans; and
> Victor Lewis, who was wearing a blue North Face 'hoodie' and a
> Blue Jays baseball cap, and had shoulder-length dreadlocks pulled
> back into a ponytail. Video shows them arriving at 1050 Tremont
> at approximately 2:20 AM on October 28[th] and entering an
> elevator.

> Although there is no video evidence of what occurred at the
> party itself, the uncontroverted testimony suggests that some of the
> partygoers began asking where others lived, and this caused the

defendant, Miranda, Collins and Lewis to become uncomfortable and decide to leave. Elevator video shows them, the victim and others leaving the second floor of 1050 Tremont at 3:17. The defendant and the victim are standing beside one another. Lewis testified that he heard the victim shout 'Mission Bitch,' apparently with reference to the defendant.

Video from a camera that pans the outside [of] 1050 Tremont captures the 5 individuals walking along a sidewalk by a vertical pillar approximately 5 feet wide at 3:17:55. At 3:17:58, the defendant, having passed the pillar returns and passes back in the opposite direction. Viewed from the street, he is then confronting the victim on the right side of the pillar at 3:18:02. Collins is not visible at this point and is presumably behind the pillar. Just before this surveillance camera pans away, a spot suggested to be Collins's shoe and his shadow can apparently be seen just sticking out from behind the pillar. Because of the lack of depth perception, the video does not show how far past the pillar (that is to it's [sic] left) Collins is standing. No evidence was offered on this point.

Another cameral shows the victim[']s body falling to the sidewalk at 3:18:03 or 04 and resting on his right side. Blood begins to pool beneath his head. That same camera shows the building security arriving beside the victim's body by 3:18:56.

A different camera picks up the defendant and Collins running along the sidewalk away from the location of the victim's body by 3:18:05. Collins is several feet ahead of the defendant. At 3:18:08, the video shows an object in the defendant's right hand by his side. The Commonwealth maintains that is a firearm. There is no evidence of Collins holding an object as he pumps his arms while running.

Six shell casings were recovered at the scene, five from the sidewalk and one from a flowerbed. The casings were made by different manufacturers of .9mm ammunition, but all were determined to have been fired from the same weapon. A weapon was also recovered from the victim's waistband. It was loaded with .380 caliber ammunition.

The defendant was arrested on November 20, 2012 at 3 Oakhurst St. in Dorchester. Mr. Collins and others lived at that address, the defendant did not. By the time of trial, Collins and the

defendant had been friends for 4 or 5 years and Collins was present when the defendant was arrested. The residence was frozen and search warrant obtained. A number of .9mm bullets were recovered from a drawer in Collins' bedroom. They were the same type as the shell casings recovered at the scene.

At trial the medical examiner, Dr. Kimberly Springer, testified that the victim had six gunshot wounds: entrance and exit wounds from three bullets. The fatal wound entered just above the victim's left eyebrow and exited the back of his head on the right side. There was stippling on the defendant's face, from which Dr. Springer concluded that this was an intermediate range wound and the bullet could not have been fired from more than 3 and ½ feet away. An additional wound entered the lateral side of his left thigh and exited on the inner side and there was a wound to his left leg (entrance and exit could not be determined for this wound).

The defendant called Delando Hawthorne as a witness. At the time of the incident, he lived across the street from 1050 Tremont in a rooming house. He testified that he had been invited to the Halloween party but decided not to go. He was out walking his dog at 3:00 AM and witnessed the shooting from across Tremont Street. He heard four or five shots fired in rapid succession and saw muzzle flashes. He testified that the shooter was a brown skinned man, about 5' 8" tall with a slim build. He was wearing dark clothing and a dark blue baseball hat. He was certain that the shooter was not wearing a white hat.

At trial the defendant argued that Collins was likely the shooter. He was a closer match to the description that Hawthorne gave. Collins initially lied to the police that he was not at the party. Similar ammunition to the shell casings recovered outside 1050 Tremont w[as] found in his bedroom drawer. The location of the shell casings on the sidewalk was closer to where Collins was standing at the time of the shooting than the defendant. And, the trajectory of the bullet (left to right) suggested the shooter was more likely standing where Collins was purportedly last seen in the surveillance video than where the defendant stood.

Ex. B pp. 2-5 (footnotes omitted).

## ARGUMENT

**THE DEDFENDANT'S MOTION TO RECONSIDER THE DENIAL OF HIS MOTION FOR A NEW TRIAL SHOULD BE DENIED BECAUSE IT IS UNTIMELY AND MERITLESS, AND HIS MOTION TO STAY THE EXECUTION OF HIS SENTENCE SHOULD BE DENIED BECAUSE, WHILE HE HAS PERHAPS PRESENTED AN ISSUE THAT WILL REQUIRE A LEGITIMATE EVALUATION BY ANY APPELLATE COURT, HE IS A FLIGHT RISK AND A DANGER TO THE COMMUNITY, AND THE "COVID FACTOR" WEIGHS AGAINST HIS RELEASE.**

### A. *The defendant's motion for reconsideration is untimely and meritless.*

The defendant's motion for reconsideration is untimely and meritless. The motion for a new trial for which the defendant requests reconsideration was denied over a year before the motion for reconsideration was filed (Ex. A p. 19-20; Ex. B). In the intervening period, Judge Kaplan, who presided over the defendant's trial and considered and denied the defendant's motion for a new trial, retired from the bench (a fact that the defendant acknowledges in his motion for reconsideration). *See* D.Pend.Mtn. p. 17 n. 17; *see also* https://www.mass.gov/service-details/2020-and-previous-vacancies (noting that Judge Kaplan retired from the bench on July 10, 2020). The defendant's motion to reconsider is untimely, and should be denied on that basis alone. *See, e.g., Commonwealth v. Montanez*, 410 Mass. 290, 294 n. 4 (1991) ("[A] motion for reconsideration must be brought within a 'reasonable time,' which in criminal matters, is construed as the period allocated for noticing an appeal. Rule 4(b) requires that such appeals be filed within thirty days.") (quoting *Commonwealth v. Cronk*, 396 Mass. 194, 197 (1985)); *Commonwealth v. McConaga*, 79 Mass.

App. Ct. 524, 529 (2011) (Commonwealth's motion for reconsideration, filed sixty days after the entry of order allowing defendant's motion to suppress, was untimely where it was filed outside the period allocated for noticing appeal). The defendant waited over a year after his motion was denied – and nearly six months after the Judge who decided the motion had retired – to bring his motion for reconsideration. It is untimely and should be denied on that basis alone.

Moreover, despite the defendant's assertion to the contrary (D.Pend.Mtn. 17), there has been no "change in circumstances" with respect to his case. As Judge Kaplan noted in his decision on the defendant's motion for a new trial, the defendant's theory at trial was that he was not the shooter, and that John Collins was the more likely shooter due, in part, to his positioning when the victim was shot, and the trajectory of the fatal bullet (Ex. B. p. 4-5). When the defendant filed his pro-se motion for post-conviction relief in April 2018 (Paper #137), it contained the expert report of Jonathan L. Arden, M.D., a forensic pathologist (Paper #139), who opined that "the features of the gunshot wound (including the location, trajectory and gunpowder residues) and the locations of the ejected cartridge casings are inconsistent with having been fired from a gun where Mr. Yarde was located in the videos taken immediately before the shooting." (Paper #139, Arden Report). When attorneys Adams and Williams filed the defendant's "final and comprehensive" motion in February 2019, they included a letter purportedly from an individual named Elizabeth A. Laposata, M.D., FCAP, FASCP (a forensic pathologist); and a report titled "Examination of Surveillance

11

Videos from 1050 Tremont St., Boston, MA – October 28, 2012 Relating to the

Case of David Yarde, Defendant," purportedly authored by Michael R. Garneau,

who self-identified as a "Moving Media Expert" and an "A/V Forensic Expert"

(Attachments to Paper #153).  Dr. Laposata opined that "[i]t is impossible for the

shots to have originated from Mr. Yarde's position." (Paper #153, Att. A p. 2).

Mr. Garneau offered his opinion regarding the precise time that the victim was

shot (a point which the Commonwealth does not dispute) and suggested that,

based on his review of the video, the defendant was not the shooter (Paper #153,

Att. B pp. 7-8; Paper #154 pp. 29-31).  In his motion for reconsideration, the

defendant offers the Arden Report and a new expert report, this one from Lewis

H. Gordon who "provides consultant forensic science services throughout the

United States in case analysis, trial preparation, and post-trial strategy, in the area

including, but not limited to; ballistics/firearms' examination and crime scene

reconstruction, including shooting incident reconstruction." (D.Pend.Mtn. Att. 1).

Mr. Gordon concludes that the defendant could not have been the shooter

(D.Pend.Mtn. Att. 1 p. 15).

Setting aside the fact that the source of Mr. Gordon's "expertise" is

unknown (his curriculum vitae is not attached to the defendant's motion), the

retention of a new expert does not amount to a change in circumstances.

*Commonwealth v. Demirtshyan*, 87 Mass. App. Ct. 737, 741 n.8 (2015) ("A

genuine motion for reconsideration must be based on: (1) a change in

circumstances such as (a) newly discovered evidence or information, or (b) a

development of relevant law; or (2) a particular and demonstrable error in the original ruling or decision.") (internal quotation marks and citations omitted). As Judge Kaplan found, the arguments that the defendant advances in his motion for a new trial are the same arguments advanced by trial counsel during trial and in his closing argument (Ex. B p. 9). The same is true of his motion for reconsideration. There has been no "change in circumstances," merely the retention of a new "expert" analyzing evidence already before the jury and the motion judge.

The defendant's motion for reconsideration is untimely. Judge Kaplan has retired and cannot reconsider his prior order. Moreover, there has been no "change in circumstances" that would warrant reconsideration of Judge Kaplan's order at this juncture. The defendant's motion for reconsideration should be denied.

### B. A stay of the execution of the defendant's sentence is inappropriate because the defendant poses a flight risk and a danger to the community, and the "COVID Factor" weighs against his release.

Currently, three considerations govern the discretion any judge may exercise in reviewing a stay request: (1) whether the appeal presents "an issue which is worthy of presentation to an appellate court, one which offers some reasonable possibility of a successful decision in the appeal," *Commonwealth v. Allen*, 378 Mass. 489, 498 (1979); (2) "the possibility of flight to avoid punishment; potential danger to any other person or to the community; and the likelihood of further criminal acts during the pendency of the appeal,"

*Commonwealth v. Hodge* (No. 1), 380 Mass. 851, 855 (1980); and (3) "the health risk to the defendant if the defendant were to remain in custody," which includes "the *general* risk associated with preventing COVID-19 transmission and minimizing its spread in correctional institutions to inmates and prison staff, and the *specific* risk to the defendant, in view of his or her age and existing medical conditions, that would heighten the chance of death or serious illness if the defendant were to contract the virus," *Christie v. Commonwealth*, 484 Mass. 397, 401-402 (2020).   More succinctly, during this pandemic "a judge must give careful consideration not only to the risks posed by releasing the defendant — flight, danger to others or to the community, and likelihood of further criminal acts — but also, during this pandemic, to the risk that the defendant might die or become seriously ill if kept in custody." *Id.* at 398.

Here, the defendant stands convicted of second degree murder.   While he has, perhaps, presented an issue which will require a legitimate evaluation by an appellate court, both the nature of the crime for which he stands convicted and his history of violent institutional disciplinary issues – some of them recent – indicate that his release would pose a risk to the community.   The defendant has also indicated that most of his family resides in his native Barbados and that he would like to return there, and thus, he is also a flight risk.   Finally, while the Commonwealth acknowledges that carceral facilities face unique challenges in attempting to keep their populations safe during the COVID-19 pandemic, *see, e.g.*, *Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court (No.*

*1)*, 484 Mass. 431, 436 (2020) ("All parties agree that, for several reasons, correctional institutions face unique difficulties in keeping their populations safe during this pandemic"), the COVID-19 vaccine is available to the defendant as a prisoner right now, whereas, based on his age and the fact that he has not claimed to suffer any underlying health conditions, it could be months before he is eligible to receive the vaccine if he was not in prison.  His motion for a stay of the execution of his sentence should be denied.

### 1. *The Defendant has likely presented an issue that would "require a legitimate evaluation" by an appellate court, were he to properly pursue an appeal.*

In order to be granted a stay, the defendant must present at least one "issue which is worthy of presentation to an appellate court, one which offers some reasonable possibility of a successful decision in the appeal." *Allen*, 378 Mass. at 498 (quoting *Commonwealth v. Levin*, 7 Mass. App. Ct. 501, 504 (1979)). Recently, in *Commonwealth v. Nash*, 486 Mass. 394, 403-404 (2020), the SJC clarified the standard to be applied to the first criterion for a stay.  The Court explained:

> [T]he burden on the defendant to establish the requisite possibility of success is not onerous; yet the defendant must show that there is at least one appellate issue of sufficient heft that would give an appellate court pause — in other words, one or more issues that require a legitimate evaluation, that would engender a dialectical discussion among an appellate panel where both sides find some substantive support, and that would, if successful, lead to a favorable outcome for the defendant.

*Nash*, 486 Mass. at 404.  While, as discussed *supra*, the defendant's motion for reconsideration is untimely and should be denied, were he to seek the appropriate

form of review of the denial of his motion for a new trial (*i.e.*, an appeal of that order) and/or an appeal from his convictions, he has likely presented an issue that would "require a legitimate evaluation" by an appellate court. *Nash*, 486 Mass. at 404.

In its opposition to the defendant's motion for a new trial, the Commonwealth did not dispute that the surveillance video (which documents the seconds immediately before and after the fatal gunshot wound to the victim), and the autopsy report (which documents the trajectory of the fatal bullet), were important pieces of evidence used to convict the defendant. *See* Commonwealth's opposition to the defendant's motion for a new trial (Paper #154 at pp. 8-10; 12-14; 24-31). The Commonwealth again acknowledges the importance of this evidence, which was submitted to the jury at trial and to the Judge at the motion for a new trial phase.[6]

The Commonwealth's view of the video has not changed since it filed its opposition to the defendant's motion for a new trial, nor has the defendant's. The defendant continues to maintain, as he did in his motion for a new trial, that he could not have fired the fatal shot given his position and distance from the victim

---

[6] As noted on page 7, n. 13 of its opposition to the defendant's motion for a new trial, nine clips of surveillance video were admitted at trial as Exhibits 28-36 respectively (Tr. 3:205, 207, 209, 210, 212, 216, 218, 220, 221). For the convenience of the jury, all of the video clips were copied onto a thumb drive which was admitted as Exhibit 92 (Tr. 10:17-18). For the Court's convenience, the Commonwealth duplicated the surveillance video clips from Exhibit 92 onto a thumb drive and submitted the thumb drive with its opposition to the defendant's motion for a new trial. The Commonwealth also provided a thumb drive containing these materials to the defendant's attorney at the time, Attorney Williams.

at the time of the fatal shot.  *Compare* Paper #153 pp. 13-13c; *with* D.Pend.Mtn. pp. 9-16.  Judge Kaplan clearly considered the defendant's argument when he denied the defendant's motion for a new trial (Ex. B  pp. 2-10).

Should the defendant wish to have Judge Kaplan's order reviewed, he should file a motion to reinstate his appeal (which the Commonwealth will not oppose), and appeal the denial of his motion for a new trial and/or his convictions. The Appeals Court will review the surveillance video and the autopsy report and photographs *de novo*. *See Commonwealth v. Mazza*, 484 Mass. 539, 547 (2020) (in the context of reviewing denial of motion for a new trial, appellate court reviews documentary evidence de novo); *Commonwealth v. Tremblay*, 480 Mass. 645, 656 (2018) (appellate court in as good position as motion judge to review documentary evidence).  If he elects pursue an appeal, the defendant has likely satisfied the standard set forth in *Nash*, 486 Mass. at 404.  The defendant's claim that it is impossible that he was the shooter (given the relative positioning of the defendant and the victim at the time the fatal shot was fired and the trajectory of the fatal gunshot wound), would likely "give an appellate court pause," and "require a legitimate evaluation" of the video and the autopsy report and photographs. *Id.* If, after a *de novo* review of these materials, the Appeals Court were to draw a different conclusion from this evidence than the detectives who investigated the murder, the trial prosecutors, the jury, the motion judge, and the undersigned ADA, such a review would lead to a "favorable outcome" for the defendant. *Id.* Accordingly, should he elect to pursue the appropriate mechanism

of review of his claims, he has likely satisfied the low threshold clarified in *Nash*, for a colorable claim. *Id.*

### 2.   *Security factors weigh heavily against the defendant's release.*

Execution of a sentence may only be stayed if "the defendant presents no risk of flight or danger to the community, and he is unlikely to commit additional criminal acts during the pendency of his appeal." *Hodge*, 380 Mass. at 855; *Allen*, 378 Mass. at 498.   Considerations that guide the judge in determining whether a defendant is a security risk include the possibility of flight to avoid punishment, the potential danger to any other person or to the community, and the likelihood of further criminal acts pending appeal. *Hodge*, 380 Mass. at 855; *Allen*, 378 Mass. at 498.   A judge may also consider the seriousness of the crime of which the defendant was convicted, the strength of the evidence presented at trial, and the severity of the sentence imposed. *Nash*, 486 Mass. at 405.   Here, a stay is not warranted because the defendant is both a flight risk and a danger to the community.

In the context of seeking bail, the potential penalty and the defendant's risk of flight must be given special attention. *Vasquez v. Commonwealth*, 481 Mass. 747, 754 (2019).   In the context of a stay, the sentence the defendant is serving is an even greater concern because it is no longer a mere possibility but now a surety. *See Vasquez*, 481 Mass. at 755-56 (strength of the case against the defendant pretrial increases the risk of flight).   The defendant has been sentenced to life in prison with the possibility of parole after 15 years.   He has also

expressed (in letters to the District Attorney's Office) that most of his family is in Barbados, and that he considers Barbados home.[7] The fact that the defendant has been convicted of second degree murder, is serving a life sentence, and considers another nation home, suggests that he would be a flight risk if he were released from prison on a stay. Further, even if the defendant were to succeed on his motion for a new trial, he would be entitled to a new trial but would still stand indicted for first degree murder. *See Vasquez*, 481 Mass. at 754 ("The risk of flight is at its greatest where the defendant stands accused of murder in the first degree because of the magnitude of the punishment faced by the defendant upon conviction — a mandatory sentence of imprisonment for life without the possibility of parole"). If released, the defendant has little incentive to return to custody after the COVID-19 pandemic abates.

With respect to a security risk, the defendant stands convicted of a brutal murder in which the victim was shot three times: once through the head and twice in the leg. The murder appears to have resulted from nothing more than a verbal dispute at a Halloween party. The nature and circumstances of this crime alone suggest that the release of the defendant would pose a danger to the community.

---

[7] These letters can be made available to the Court upon request.

Additionally, the defendant's institutional disciplinary reports paint a troubling picture.[8] On December 26, 2019, he was involved in an assault on another inmate that left the victim with serious injuries requiring treatment at a hospital (D-Report No. 451791). On May 12, 2019, he was involved in a violent altercation with a different inmate (D-Report No. 436044). On January 16, 2019, he was involved in a violent altercation with two other inmates and admitted to his involvement, stating that the altercation resulted from a "feud from the street" (D-Report No. 428336). The defendant's board of probation report also indicates that he was convicted of possession of a firearm without a license in 2010.

### 3.  *The "COVID-Factor" weighs against the defendant's release.*

Finally, the defendant has not presented any evidence of underlying health conditions that would put him at increased risk of serious complications were he to contract COVID-19, nor does his age (thirty years old) put him at particular risk.      *See*      https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. As the Supreme Judicial Court recognized in *Foster v. Commissioner of Correction (No. 1)*, 484 Mass. 698, 705-706 (2020), the Department of Correction has taken significant steps to prevent the spread of COVID-19 in all Massachusetts correctional facilities. These steps include, *inter alia*: implementing physical distancing measures within all DOC facilities; enhancing cleaning regimens in all DOC facilities; providing

---

[8] The institutional disciplinary reports in the Commonwealth's possession are current as of February 3, 2021. The Commonwealth will provide these reports to the Court upon request.

disinfectant cleaning supplies to inmates so that they can clean their own cells; distributing surgical face masks to all inmates; requiring that staff wear masks at all times within the facilities; limiting visitors to DOC facilities; and conducting widespread testing of inmates and staff members. *Id.* Despite these measures, the Commonwealth does not dispute that carceral facilities face unique challenges in attempting to keep their populations safe during the COVID-19 pandemic. *See Foster*, 484 Mass. at 718 ("there can be no real dispute that the increased risk of contracting COVID-19 in prisons, where physical distancing may be infeasible to maintain, has been recognized by the [Centers for Disease Contron] and by courts across the country"); *Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court (No. 1)*, 484 Mass. 431, 436 (2020) ("All parties agree that, for several reasons, correctional institutions face unique difficulties in keeping their populations safe during this pandemic"). The defendant is likely at greater risk of contracting COVID while incarcerated than he would be in a setting more conducive to social distancing and improved hygiene. That being said, the COVID-19 vaccine is available to the defendant as a prisoner right now, whereas, based on his age and the fact that he has not claimed to suffer any underlying health conditions, it could be months before he is eligible to receive the vaccine if he was not in prison.[9]

---

[9] The defendant has not provided any information on his vaccination status.

21

## **CONCLUSION**

For the forgoing reasons, the Commonwealth respectfully requests that the defendant's untimely motion for reconsideration of the denial of his motion for a new trial, and motion to stay the execution of his sentence be denied.

<div style="margin-left: 45%;">

Respectfully Submitted,
FOR THE COMMONWEALTH

RACHAEL ROLLINS
District Attorney
For the Suffolk District

*Dara Z. Kesselheim*

_____
DARA Z. KESSELHEIM
Assistant District Attorney
Deputy Chief, Integrity Review Bureau
BBO#: 660256
One Bulfinch Place
Boston, MA 02114
(617) 619-4074
dara.kesselheim@state.ma.us

</div>

March 24, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was sent to the defendant's counsel electronically addressed as follows:

Gordon Spencer, Esq.
attyspencer@aol.com

By:  *Dara Z. Kesselheim*
     _____
     Dara Z. Kesselheim

March 24, 2021

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUFFOLK SUPERIOR COURT
                                               DOCKET NO.: 2012-11181

---

COMMONWEALTH                )
                            )
                            )
                            )
v.                          )
                            )
                            )
DAVID YARDE                 )
                            )
---

## DEFENDANT'S REPLY TO COMMONWEALTH'S OPPOSITION TO THE DEFENDANT'S EMERGENCY MOTION TO STAY THE EXECUTION OF HIS SENTENCE PENDING DECISION ON HIS MOTION TO RECONSIDER HIS MOTION FOR NEW TRIAL

> **"Courts have inherent power 'to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial whenever his life, liberty, property, or character is at stake'".**

*Crocker v. Justices of the Superior Court*, 208 Mass. 162, 179 (1911).

Mr. Yarde provides this reply to the Commonwealth's opposition.  Based upon the quote promulgated by the Supreme Judicial Court more than a century ago, Mr. David Yarde is seeking this Court to exercise the inherent power that it has, to do whatever may be done to insure that he obtains relief, as his life and liberty is at stake after being unfairly convicted after a trial, on a charge for which he has provided evidence of his innocence, and where the Commonwealth has not provided any evidence to suggest otherwise.  Approximately two months ago, Mr. Yarde provided this Court with a 22 page memorandum to this Court, which not only provided evidence that he is innocent of the crime for which he was convicted, but which also demonstrated that the trial court committed (unintentional) error in recognizing that innocence.

This 22 page memorandum thereby asked the Superior Court judge who presided over his trial (Kaplan, J.) to reconsider its' original ruling which DENIED his motion for his new trial. Judge Kaplan has since retired, but it is well settled that, although it is preferable that such a motion be decided by the original trial judge, a decision by a different judge of the same court is entirely proper. *Commonwealth v. Gedzium*, 261 Mass. 299, 300, 308-09 (1927).

As such, this Court is now presently tasked with considering what is at stake – first, a person in jail for over 8 years who has claimed innocence; second, a person who has presented evidence of his innocence; third, a Motion which has brought all of this to the forefront; and fourth, the Commonwealth who has not provided any evidence to refute his innocence – rather choosing to reply in telling this Court "perhaps" Mr. Yarde has presented a viable appellate issue. Where is all of their confidence NOW which they have previously displayed during the trial of this case and during their opposition on Mr. Yarde's Motion for New Trial before Judge Kaplan? The 22 page memorandum filed by Mr. Yarde goes into painstakingly detail what exactly went wrong in his case – and it doesn't revolve around some "hail-mary" challenge with some jury instruction or some tenuous argument, that the prosecutor overly aggressive during her closing argument. Rather, the 22 page memorandum goes to the heart of whether this man actually did the crime. A claim such as this is not one which the Commonwealth should take lightly. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (A prosecutor is a "servant of the law, the twofold aim of which is that the guilt shall not escape or innocence suffer").

Based upon Mr. Yarde providing what he believes to be conclusive proof of his innocence to a prosecuting agency, he presumed (and over the course of the two months that they had to investigate it) that the Commonwealth would respond very simply in one of two ways: a) either they have their own expert which challenges Mr. Yarde's proof – suggesting a new trial

would be in order as the jury never heard from either; or b) they don't have any evidence to challenge Mr. Yarde's proof – supporting the inference that they must concede his innocence. Mr. Yarde awaited to see which response was going to be answer of the hour. Approximately 2 months later, Mr. Yarde was served with a 21 page opposition which claims that Mr. Yarde's motion is: a) time-barred and b) meritless. But it doesn't end there. The Commonwealth then goes on to state, and in spite of the Motion for Reconsideration's lack of merit: c) Mr. Yarde's underlying Motion for New Trial now "perhaps" raises a legitimate issue for appellate consideration. *See Commonwealth Opposition at pp. 14-17.*[1]

Thereafter, the Commonwealth finishes up their opposition by suggesting that all of Mr. Yarde's "legitimate appellate issues" notwithstanding, he is just too much of a flight risk and

---

[1] Putting aside the fact (for a moment) that the Commonwealth's 21 pages says nothing about Mr. Yarde's declaration of innocence, Mr. Yarde would like to just highlight now (for a moment) that the way the Commonwealth is behaving in their opposition is particularly confusing, as it raises all sorts of questions but provides no answers. For starters, when Mr. Yarde presented his *original* Motion for a New Trial (dkt entry 153), where he presented expert testimony of his innocence, the Commonwealth attacked his innocence claims with vigor, and with a particular emphasis upon the expert (Laposata) who was the backbone of the premise. *See dkt entry no.* 154 – the Commonwealth's vigorous opposition to Mr. Yarde's claim of innocence as outlined in his Motion for a New Trial. Thereafter, Judge Kaplan also agreed with how the Commonwealth viewed Mr. Yarde's Motion for New Trial – also opining that it was without merit. *See dkt entry* no 164 at p. 10. Now, and where Mr. Yarde files a Motion for Reconsideration of the DENIAL, showing the error in Judge Kaplan's analysis, and re-asserting his innocence, and where the Court gave the Commonwealth 60 days to respond to the claims of innocence and error based upon Mr. Lewis Gordon's report, upon their resurface, we don't see the Commonwealth as blusterous as they once were. First, they don't provide any commentary about whether Judge Kaplan was in error (warranting the inference that they too see the error), and second, we don't see any commentary disputing Mr. Gordon's report (warranting the inference that they too see evidence of his innocence). But then, and here is where all of the confusion lies, but instead of just being a real prosecutors – ones who seek justice over a conviction, they tell this Court, in essence, Mr. Yarde's claim of *scientifically undisputed* innocence is time-barred before this Court, but he "perhaps" raises a legitimate issue for appellate consideration? *Id.* at pp. 14-17. After Mr. Yarde has just talked this out, the Commonwealth's response is no longer confusing but actually concerning, as they presently do not appear to be the transparent agency which our public expects, where they on the first-hand attack Mr. Yarde's original Motion for New Trial (which claimed innocence) as meritless, and now after reconsideration, suggests the same motion (which re-asserts innocence) has a viable avenue for appeal? But then and at the same time they are opposing the Superior Court to consider whether Judge Kaplan was in error, and also keep Mr. Yarde locked up while he seeks relief for an overt problem which can be handled now? This is the presentation which the Commonwealth has given us after two months of reflection. Their response should really speak for itself.

danger to the community to consider for release?  Oh, and as an aside, the Commonwealth never once in its' 21 page memorandum provides ANY argument which supports ANY belief that the Defendant is not factually innocent, except by saying that "the video. . . provides graphic evidence sufficient for a jury to reach the verdicts which it returned." *Commonwealth opposition at page* 6.

However, there is an asterisk which must be assigned to that conviction, since the jury which believed he was guilty (based upon a video which has four potential shooters and does not show which one did it) was not given the forensic expert we have today which would have explained that NO inference of Mr. Yarde' guilt could have been drawn from ANY review of that video.  In fact, and scientifically speaking, the only inference which could be drawn is one of innocence.  Since the jury never heard from Mr. Lewis Gordon, Yarde submits that his conviction is not worth the paper it is written on.  It is also worth further mentioning (again) that within its' 21 page memorandum, the Commonwealth never once challenged the conclusions made by Mr. Gordon of Mr. Yarde's innocence, with the exception of asking for his Curriculum Vitae – *which is enclosed as* exhibit 1.[2]

The point is that the Commonwealth has argued to this Court that the Defendant's Motion for Reconsideration should be DENIED on procedural grounds, but has not opposed this man's innocence in any meaningful or substantive way – a circumstance which Mr. Yarde believes would trump any procedural barrier to obtaining justice. Mr. Yarde has waited 60 days for the Commonwealth's response, which he expected would indicate their position on whether he is

---

[2] This comment is also disingenuous, as based upon information, and belief, the Commonwealth is very well aware of Mr. Gordon's work, as he has performed professional seminars all over the state, which also served to instruct members of the law enforcement community including the Boston Police Department.  If this is true, the Commonwealth should already have Mr. Gordon's Curriculum Vitae, and should already be quite familiar with his credentials, all of which are outlined via *exhibit 1*, Mr. Yarde submits those credentials are more than sufficient for him to provide the opinions which he has provided.

4

innocent or not, and his patience has yielded disappointing results. Therefore, and in this reply

Mr. Yarde poses to the Commonwealth the question again:

> *"Have you reviewed the report of Mr. Lewis Gordon, which has*
> *proclaimed Mr. Yarde's innocence, and do you have a counter-*
> *report, argument, opinion, and/or otherwise which refutes it?"*

To make sure that the Commonwealth is properly reminded on how to answer this question,

Judge Kaplan did not have the benefit of Mr. Gordon's report and neither did the jury, so Mr.

Yarde does not want to hear any response from the Commonwealth which references any

uninformed or uneducated findings by either of those bodies during past hearings. In 2021, Mr.

Yarde has explained to this Court from a scientific analysis why he could not have committed

this crime, and after review of the Commonwealth's response to Yarde's protestations of

innocence, it actually reads as their concession of an active **"miscarriage of justice"** taking

place, and as a gratuity they give Mr. Yarde their blessing in seeking relief from our appellate

courts.[3]

No. Yarde seeks assistance from this Court to invoke the inherent powers that it has to:

<p align="center">**"<u>prevent or mitigate miscarriages of justice</u>"**</p>

*Soe v. Sex Offender Registry Board*, 466 Mass. 381, 395 (2013) (emphasis added) citing
*Commonwealth v. Charles*, 466 Mass. 63 (2013).

In other words, this Court has to power to act now, and not kick this stone down the road.

This is without dispute, as nowhere contained within the Commonwealth's response do they ever

suggest that this Court does not have the power to release him. Rather, they have given a luke-

warm opposition to the Court exercising its' inherent authority, suggesting don't do it because:

---

[3] *See page 16 of the Commonwealth's opposition as outlined hereto*: "Should the defendant wish to have
Judge Kaplan's order reviewed, he should file a motion to reinstate his appeal (which the Commonwealth
will not oppose), and appeal the denial of his motion for a new trial and/or his convictions". Before Mr.
Yarde is necessarily forced to go that route, he is first seeking to address and preserve an alleged error
which has gone unnoticed and without attention – the error alleged to have been committed by Judge
Kaplan in DENYING Mr. Yarde's Motion for New Trial.

1) he is going to flee (on a second-degree murder conviction where he has served over half the time before he is parole eligible); or by saying 2) that because a jury convicted him of second-degree murder (in spite of the fact that we NOW have evidence that he is innocent), that conviction which is still on the books serves as sufficient proof (standing alone) that he is a danger to others.   However and unconvincing as their arguments are, Mr. Yarde still cannot understand why, and within their 21 page opposition, the Commonwealth has just outright ignored the most dire issue on the table – whether this man actually committed any murder. They were certain of it in their opposition of Mr. Yarde's Motion for New Trial.  Now, and after Yarde's Motion to Reconsider asks for a revisit, they now change it up and leave that certainty in the past, and presently concede that his Motion for New Trial now presents a "legitimate appellate issue".  However, and in the same sentence still urging the Court to deny the Motion for Reconsideration at the trial level because it is time-barred.  Mr. Yarde is not sure what sense this is all making.  Meaning, Yarde shows an error (and again unwitting error) by a Superior Court Judge on a Motion for New Trial, and the Commonwealth doesn't respond to the error but rather states that the motion has come too late?  Yarde submits that whether this motion is late or not, this Court still has the inherent power and discretion to hear it, in light of the controversy at issue, he has established that there are special circumstances which warrant it.

***This Court has the inherent power and discretion to hear this Motion for Reconsideration filed after any required time period which governs for doing so, as there are special circumstances warranting it.***

As it pertains to timeliness of his Motion for Reconsideration, Mr. Yarde directs the Court to *Mass. R. Crim. P.* 13(a)(5), which states:

> "As a general matter, a judge may permit a motion that has
> been heard and denied to be renewed when "substantial
> justice requires."

Further, a judge's power to reconsider his own decisions during the pendency of a case is firmly rooted in the common law, and the adoption of rule 13 was not intended to disturb this authority. *See Commonwealth v. Haskell*, 438 Mass. 790 (2003) (five year time-gap between the judge's initial ruling and his allowance of the defendant's motion for reconsideration was ***within the judge's discretion to reconsider his ruling despite the passage of time***) (emphasis added). *But see Commonwealth v. Balboni*, 419 Mass. 42, 43-44 (1994) (***"In the absence of special circumstances . . .*** motion to reconsider is the same time period allowed for appeal.) (emphasis added).[4]

Mr. Yarde claims the special circumstances here are ones which should allow him to file a Motion for Reconsideration outside the 30 day time period are: 1) his innocence – which the Commonwealth has not disputed in its' filings; and where said undisputed claim of innocence results in an 2) "exceptional circumstance" to justify the exercise of its' "inherent power". *See Commonwealth v. Pagan*, 445 Mass. 315, 322 (2005) (Court requiring "exceptional circumstances" to justify the exercise of its' "inherent power"). Before the Commonwealth seeks to deny Mr. Yarde from filing this motion on procedural grounds, the Commonwealth should first explain why the present circumstance does not present a circumstance of the exceptional kind, and allow the Court to consider the substance of the motion to administer justice. See below:

---

[4] Additionally, even where there has been a procedural waiver (as what the Commonwealth is essentially alleging here) a claim still may always be reviewed for a "substantial risk of a miscarriage of justice". See *Commonwealth v. Lavoie*, 464 Mass. 83, 89 (2013); *See also Commonwealth v. Glover*, 76 Mass. App. Ct. 799, 804 (2010). Even if the Commonwealth is claiming that the Motion for Reconsideration is time-barred, based upon the holding in *Lavoie*, they are surely not arguing that the issue which Yarde has raised (error by Judge Kaplan in deciding Mr. Yarde's Motion for New Trial) is waived – since the issue can always be reviewed for a "substantial risk of a miscarriage of justice". As a result the question becomes, why is the Commonwealth trying to stop this Court from addressing an issue which is alleged to have caused a substantial risk of a miscarriage of justice, where they know it must necessarily reviewed later? Yarde maintains that the gravity of the situation gives this Court the authority to act now.

> "It has long been recognized that the inherent powers of courts are those that are "essential to the performance of their functions, to the maintenance of their authority, and to their capacity to determine the rights of parties according to law".

*Blakenburg v. Commonwealth*, 260 Mass. 369, 373 (1927); *See also Sheriff of Middlesex County v. Commissioner of Correction*, 383 Mass. 631, 636. (1981).

If Mr. Yarde were asking Judge Kaplan to reconsider his interpretation on the law, or re-assess the strength of the evidence, that would be one thing.  But this Motion to Reconsider specifically calls out an obvious but unintentional mistake by Judge Kaplan regarding how he analyzed the possible guilt or innocence of Mr. Yarde.   Mistakes or "demonstrable error" are fundamentally at the core of why Motions to Reconsiderations are filed. *See Audubon Hill S. Condominium Ass'n v. Community Ass'n Underwriters  of Am., Inc.,* 82 Mass. App. Ct. 461, 470 (2012), citing *Peterson v. Hopson*, 306 Mass. 597, 600 (1940) (Motions for Reconsideration have merit if they are based upon a particular or "demonstrable error" in the original ruling or decision).

The Commonwealth's response to all of this?  Two paragraphs of information contained within their opposition claiming that Mr. Yarde's Motion to Reconsider is "meritless" – but without any real substance telling this Court as to why.

*Mr. Yarde's Motion to Reconsider has undisputed and unchallenged merit.*

a. **The legal standard for motions to reconsider.**

The Commonwealth is correct that under *Commonwealth v. Demirtshyan*, 87 Mass. App. Ct. 737, 741 n.8 (2015) ("A genuine motion for reconsideration must be based on: (1) a change in circumstances such as (a) newly discovered evidence or information, or (b) a development of relevant law; or (2) a particular and demonstrable error in the original ruling or decision.") (internal quotation marks and citations omitted).

**b. Mr. Yarde has shown a demonstrable error in Judge Kaplan's original ruling and error which has yet to be challenged by the Commonwealth.**

On page 12 of the Commonwealth's opposition, the Commonwealth provides just 2 paragraphs of information which speak to Judge Kaplan's findings. They are provided below in quotes:

> "As Judge Kaplan found, the arguments that the defendant advances in his motion for a new trial are the same arguments advanced by trial counsel during trial and in his closing argument (Ex. B p. 9). The same is true of his motion for reconsideration. There has been no "change in circumstances," merely the retention of a new "expert" analyzing evidence already before the jury and the motion judge. . . there has been no "change in circumstances" that would warrant reconsideration of Judge Kaplan's order at this juncture. The defendant's motion for reconsideration should be denied".

*See Commonwealth's opposition at page 12.*

To be sure, and in Mr. Yarde's original Motion for New Trial, Mr. Yarde first provided to Judge Kaplan an expert report from a Dr. Elizabeth Laposata, claiming Mr. Yarde was innocent, based upon her opinion that he could not have shot the alleged victim in his case from his last known position. *Dkt. 153*, *Exhibit A*, p. 2. The Commonwealth thereafter provided an extensive opposition challenging this innocence claim by Dr. Laposata. *See dkt entry* 154. The Court (Kaplan, J.) followed suit with the Commonwealth, also challenging Dr. Laposata's expertise. *dkt. entry* 164, p. 6-8. A further review of Judge Kaplan's decision demonstrates, and perhaps in a moment of analytical inspiration, his speculation upon a factual theory which he believed the jurors could have inferred from the evidence to support a theory that there was a factual basis to support Mr. Yarde's guilt. See below:

> "If the defendant and the victim were both to the right of the pillar at the moment the shot is fired, an obvious possibility, the muzzle of a gun in the defendant's right hand might well have been 2 to 3 feet distant from the left eyebrow of the victim. In fact, for the bullet to have been fired from behind the left side of the pillar, the victim would have had

to have turned so that he was facing in that direction, as the bullet enters the victim above the right edge of his left eyebrow, i.e., almost in the middle of the face. The victim might have done that, but that is not the position that he is facing in the last image shown before the camera pans away."

*Id.* at p.7-8.

After this hypothetical analysis was written up in Judge Kaplan's decision to DENY Yarde relief, the Commonwealth of course remained silent – which we know served as a ringing endorsement of Judge Kaplan's way of thinking about Mr. Yarde's guilt.

Then, Mr. Yarde obtains new counsel, and the undersigned is working on the case. Undersigned counsel realizes that a crime scene reconstructionist should have been obtained on this case from its' inception. Undersigned counsel obtains a crime scene reconstructionist, who investigates the crime scene and presents "irrefutable" evidence which demonstrates that Judge Kaplan was in error. Now, and in response to Mr. Gordon's submission, we see none of the same bluster which the Commonwealth provided to challenge Dr. Laposata's opinion. Instead, they merely state that since Mr. Yarde's arguments today are the same as stated in his previous motion – there are "no change in circumstances". *Commonwealth Opposition at page* 12. What about the "change in circumstance" which reveals that Judge Kaplan is in error? There is not one word about that revelation, and it was the centerpiece of Mr. Yarde's Motion to Reconsider. Again the Commonwealth remains in their corner, silent.

Mr. Yarde submits that this second round of silence on the part of the Commonwealth is quite demonstrative of the fact that they see the problem, but have refused to make this acknowledgement on paper. Instead what they attempt to do is concede that Mr. Yarde has a legitimate appellate issue, but still argues that he shouldn't be released, because of their uncorroborated and unfounded presumptions that he poses a risk of flight and/or danger to the community, and based upon offense conduct which is presently *in doubt.*

***The Commonwealth concedes the Defendant does have a legitimate appellate issue, and has
provided no real evidence of his risk of flight and/or danger to the community***

Again, and advance apologies for ringing this bell one last time, but the Commonwealth's

opposition put up no real fight to the Defendant's innocence, and only suggested the following:

> "The defendant's claim that it is impossible that he was the shooter
> (given the relative positioning of the defendant and the victim at the
> time the fatal shot was fired and the trajectory of the fatal gunshot
> wound), would likely **"give an appellate court pause,"** and "require
> a legitimate evaluation" of the video and the autopsy report and
> photographs."

*Commonwealth opposition at* p. 16.

The above language seems to suggest that the Commonwealth has conceded that Mr.

Yarde has satisfied the first element of the *Nash* inquiry, about whether a stay of his sentence

would be in order.   They won't concede that he is innocent, and Mr. Yarde is not expecting that

they would (or perhaps ever will), but at the least show the same bravado that Mr. Yarde is

showing in challenging his innocence.    Instead they give this luke-warm acknowledgment that

he has a worthy appellate issue.  The problem for them is that if they would just come out and

concede that he is innocent, they wouldn't know how to answer the question of how: 1) the

Boston Police Homicide Detectives; 2) the Assistant District Attorney who tried the case; 3) the

Trial Judge; d) the Jury; and e) defense counsel all missed it. *Id.*   Well, and to be sure, the only

categories of persons who missed it were: a) the Jury – because they were not given the proper

upload; b) trial counsel for not giving them the proper upload; and even c) post-conviction

counsel – who failed to bring it to the Court's attention so it could have the proper upload in

making an informed decision.

However, and the Commonwealth should understand by no means is Mr. Yarde giving

the Boston Police or the Suffolk County District Attorney's Office a pass for their lack of

diligent investigation, and rushing to judgment.   As the Rules of Professional Conduct make

plain, a prosecutor is a purveyor of justice first, and an advocate for conviction second.  See

Mass. R. Prof. C. 3.8, 426 Mass. 1397 (1998), & comment [1].   Detectives are part of the

investigative branch of the Boston Police Department, and their homicide division is highly

touted as one of their elite divisions.  Nobody in either office ever considered (in the interests of

diligence, thoroughness, and impartial investigations or thought) to employ the services of a

crime scene reconstructionist to support (or rebut) any theory of guilt which they had about the

defendant.  Perhaps after seeing the report from Mr. Gordon, they have considered now what

they have never before, but because we see NOWHERE in their response one word which

refutes Mr. Gordon's findings, it provides the inference that they dropped the ball on this one as

well.  This inference is actually demonstrated explicitly, when observing how their bravado

which once claimed that "he's guilty" has now morphed into a murmur, that Mr. Yarde "has a

legitimate appellate issue".

        However, and still, the Commonwealth won't agree to Mr. Yarde's release.  Why?  They

suggest that Mr. Yarde – a person convicted of second degree murder, and who has served over

half of the mandatory sentence before he is eligible for parole, is a presumed flight risk, and a

presumed danger to the community.   Their conclusions are tall on claims but short on evidence.

Mr. Yarde relies upon *Commonwealth v. Vasquez*, 481 Mass. 747 (2019) for the proposition that

a "change in circumstance" regarding the strength of the case bears a direct correlation to issues

surrounding risk of flight.  *Vasquez* at 749 ("Finally when a bail order comes before a judge for

reconsideration, the judge should also consider, among other factors . . . the strength of the

Commonwealth's case, especially if the character of the evidence has changed").   Mr. Yarde

submits that in light of the new information which has come to light, the Commonwealth's case

is no longer as robust as it once thought it was.  To be sure, and from Mr. Yarde's perspective, their case was always anemic – a whodunit murder involving a crime scene with: a) three other suspects; b) no eye-witnesses identifying Mr. Yarde as the shooter;[5] c) mitigating evidence that Mr. Yarde was always trying to avoid confrontation; d) and a WEALTH of incriminating evidence pointing to a suspect other than him, who the Commonwealth knows was also present at the crime scene, and was in more compelling location to have committed this crime.[6]

 The Commonwealth's claims that Mr. Yarde poses a high risk of flight on this case as it presently stands, and merely because Mr. Yarde has family that lives out of the country falls flat, as the United States is a country of immigrants, where most people have relatives that live somewhere across this globe.   If this Court were to confine Mr. Yarde to the Commonwealth of Massachusetts, and seize any passport he may own, and/or prohibit him from obtaining one, the Commonwealth is left without a compelling argument that he still has the means to flee. *See e.g., United States v. Cruz*, 363 F. Supp. 40 (2005) (although defendant was engaged in an extramarital affair outside Puerto Rico, had two expired drivers licenses in his possession, had two passports of which one was reported lost, and had two bogus resumes, found insufficient to determine a Defendant is too grave a risk of flight to be released on conditions).

 Mr. Yarde also contends that, and in light of this new exculpatory evidence which has come to light via Mr. Lewis Gordon, the claim that Mr. Yarde poses too great of a risk of danger to the community is also unavailing.  In support of their argument for dangerousness, the Commonwealth is still trying to cling to his second degree murder conviction which is presently

---

[5] In fact the only eye-witness in this case gave a description with DID NOT match Mr. Yarde.

[6] Not only that, but it is also worth mentioning that the Commonwealth also knows that this other suspect has since been indicted by them for another homicide, which took place after this one – and while not proof positive he did the murder for which Mr. Yarde was convicted, is highly and eerily coincidental.

13

in doubt. His criminal record reveals only one previous conviction for possession of a firearm on his record in 2010 – hardly a resume for a person who is not releasable on conditions.

## CONCLUSION

In sum, Mr. Yarde leaves the Court with the following quote:

> "Judges must exercise their inherent authority as necessary to
> secure the full and effective administration of justice."

*O'Coin's, Inc. v. Treasurer of the County of Worcester*, 362 Mass. 507, 514 (1972). *See State Realty Co. of Boston v. MacNeil Bros. Co.*, 358 Mass. 374, 379 (1970), quoting *Link v. Wabash R.R., 370* U.S. 626, 630-631 (1962)

Yarde seeks this court to exercise the power which is invested within it, and administer justice in this particular case.    To be sure, Mr. Yarde believes the Court has 2 options from which it could choose and adopt in handling this matter.    But before outlining those two options, Mr. Yarde implores this Court to first: a) require the Commonwealth to respond to the Defendant's Motion for Reconsideration stating whether they believe Judge Kaplan was in error in his analysis of the Defendant's Motion for a New Trial; and b) require the Commonwealth to respond as to whether they dispute the findings of Mr. Lewis Gordon, and if so, stating the dispute. The reason why Mr. Yarde seeks this information from the Commonwealth is obvious. Mr. Yarde is seeking to preserve his claim of error. If the Commonwealth would have it their way, they would merely have Yarde appeal Judge Kaplan's DENIAL of his Motion for a New Trial up to the Appeals Court, but doing so before any Superior Court judge has reviewed and considered Mr. Gordon's report, and where no record has actually been established whether Judge Kaplan was in error. Mr. Yarde is not sure whether this desire by the Commonwealth is inadvertently conceived or by design. In either event, Mr. Yarde submits that on the issue of whether Judge Kaplan was in actual error on the issue of Mr. Yarde's innocence, the report of Mr. Lewis Gordon must first be considered, and as of present, no Superior Court Judge has

considered it.   As such, this matter is not ripe yet for appellate review, and thus seeks the

Commonwealth to "do its' job" and state their position on: a) whether they dispute Mr. Gordon's

findings; and b) if Mr. Gordon's findings are not in dispute, whether Judge Kaplan was in error.

Thereafter, and then, Mr. Yarde submits that this Court has 2 options: 1) contact Judge

Kaplan and inquire of his desire to hear this matter; or and if he is not available 2) step in the

shoes of Judge Kaplan and decide for him.  If the Superior Court allows the Defendant's Motion

for Reconsideration, and allows the Defendant's Motion for New Trial, the Commonwealth's

appellate rights are preserved.  If the Court denies the Defendant's Motion for Reconsideration

(on its merits) and there after denies the Defendant's Motion for New Trial, after consideration

of whether Judge Kaplan is in error, then the Defendant's appellate rights are preserved.  Either

way however, and since the Commonwealth has already recognized the viability of any appeal

he takes on this issue, Mr. Yarde should still be released pending that appeal.

Mr. Yarde prays the Court's judgment.

DAVID YARDE
By his attorney,

Gordon W. Spencer, Esq.
945 Concord Street
Framingham, MA 01701
BBO# 630488
(508) 231-4822

March 26, 2021

15

I, GORDON W. SPENCER, attorney for the defendant, David Yarde, hereby certify and swear under the pains and penalties of perjury that on this 26th day of March, 2021, I have served the aforementioned pleading on the Commonwealth *by* serving it via electronic transmission (email) to:

Cailin Campbell, Esq.
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
cailin.campbell@state.ma.us

Dara Kesselheim, Esq.
Assistant District Attorney
Suffolk County District Attorney's Office
One Bulfinch Place
Boston, MA 02114
dara.kesselheim@state.ma.us

Gordon Spencer, Esq.

# Curriculum Vitae

# LEWIS H. GORDON

Telephone: 413. 896.9729      Email: forensiclg@gmail.com

## EDUCATION

*UNIVERSITY OF NEW HAVEN, New Haven, CT*

   *Masters of Science in Forensic Science (2000)*

   *Certificate in Advanced Investigations*

*WESTERN NEW ENGLAND SCHOOL OF LAW, Springfield, MA*

   *Juris Doctorate (1996)*

*WESTERN NEW ENGLAND COLLEGE, Springfield, MA*

   *Bachelors of Science in Law Enforcement (1990)*

## FIREARMS EXPERIENCE

*FORENSIC EVIDENCE & Investigations (2014 – Present)*
Owner and operator of full service firearms examination laboratory

*TIGHT GROUP FIREARMS, L.L.C., Monson, MA (2011 – 2018)*
Firearms instructor

*INVESTIGATIVE & FORENSIC SERVICES, LLC, Springfield MA (2002 – 2014)*
Investigation of criminal, civil matters and forensic consulting and Firearms Examination

*FORENSIC FIREARMS ASSOCIATES, Meriden, CT (2010 – 2013)*
Firearms consultant on shooting reconstruction, function testing, examination and comparison of physical evidence.

## AFFILIATIONS & MEMBERSHIPS

*NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS, Member*

*NATIONAL RIFLE ASSOCIATION, Member*

**CERTIFICATIONS**

*NATIONAL RIFLE ASSOCIATION*
Pistol Instructors Course (May 2014)
Home Firearm Safety Instructor Course (May 2014)


*COMMONWEALTH OF MASSACHUSETTS BASIC FIREARMS SAFETY COURSE*
Instructor (2016)

*INTERNATIONAL FIREARMS SPECIALISTS ACADEMY*
Certified Firearms Specialist *(2016)*


**FIREARMS TRAINING - *FORENSIC***

New York Microscopical Society - 2nd Annual Law Enforcement Lecture Series (June 2016)
Modern Illumination & Imaging Techniques for Firearm & Toolmark Comparison Microscopy

*INTERNATIONAL FIREARMS SPECIALISTS ACADEMY (January 2016)*
Court Testimony
Any Other Weapon
Machine Guns/Clandestine Conversions
Ammunition
Firearm Markings
Destructive Devices
Short barreled Shotgun-Rifle and Weapons Made from Shotgun Rifle
Firearm Classification
Firearm Curios and Relics
Firearm Nomenclature
Firearm Safety and Clearing
Silencers
Firearm Mechanical Operation
Firearm Cycle of Operation

Machineguns and Machinegun Conversions (AFTE, May 2015)

Projectile Deflection (AFTE, May 2015)

*AFTE (ASSOCIATION OF FIREARM AND TOOL MARK EXAMINERS)*
46th Annual Training Seminar - Dallas, Texas (May 2015)

*PENN FOSTER CAREER SCHOOL*
Career Diploma, Gunsmith (February 2015)

*ARNOLD MARKLE SYMPOSIUM-Presented by Henry C. Lee Institute of Forensic Science*

Management and Investigation of Shooting Incidents (October 2014)

*AFTE (ASSOCIATION of FIREARM AND TOOLMARK EXAMINERS)*

Fall Training, Quantico, VA (October 2014)

*FORENSIC SCIENCE CONSULTANTS, LLC*

Forensic Shooting Incident Reconstruction Course (2012)

*NORTHEAST ASSOCIATION of FORENSIC SCIENTISTS*

Attendance - Microscopy Workshop  (June 2016)

Attendance  (October 2014)

Attendance  (September 2013)

*JOHN JAY COLLEGE – Microscope Day*

Identification and Recognition of Cartridge Cases, Multi Caliber Firearms (April 2014)

*TRACE EVIDENCE ON BULLETS*

8 hour workshop, Hershey, PA (November 2014)

*SIG SAUER ACADEMY*

Bullets and Vehicles (2012)

## North East Association of Forensic Scientists

3 Day Shooting Incident Reconstruction course at Boston Police Range (May 2018)

## Northeastern University

Traces, Historical Science and the Crime Scene: The Role of the Scientist/Investigator

Training Via Zoom Meeting

## ARMORERS COURSES

Ring of Fire (AFTE, May 2015)
*Bryco, Davis, Lorcin, Jennings, Jimenez*
Hi-Point Firearms Familiarization (AFTE, May 2015)

*STURM, RUGER & COMPANY, INC.*
Armorer's Course (May 2015)

*SIG SAURER ACADEMY*

1911 Operator/Armorer Course (2012)

M16, M4, AR-15 Armorer Course (2012)

*SMITH & WESSON*

Revolver Armorer Course (2012)

M&P Pistol Armorer Course (2012)

*GLOCK, Inc.*

Glock Pistol Armorer Course (2012)

## FACTORY TOURS

Seecamp Firearms/ Factory Tour (September 2013)

Charter Arms Firearms/ Factory Tour (September 2013)

Smith & Wesson / Thompson Center (2012)

Savage Arms (2012)

## PRESENTATIONS

*POST UNIVERSITY, CSI ACADEMY*

*Forensic Firearms Examination (2012)*

*Blood Stain Pattern Analysis (2012)*

*Forensic Firearms Examination (2011)*

*Blood Stain Pattern Analysis (2011)*

## FIREARMS TRAINING - *PRACTICAL*

*CRITERION TACTICAL*

Tactical Fighting Pistol Course (June 2014)

Tactical Night Fighting Pistol (June 2014)

*UNIVERSAL SHOOTING ACADEMY*

- 2010- Advanced pistol course with instructor Emmanuel Bragg
- 2009- Intermediate/advanced & advanced course with Instructor Emmanuel Bragg
- 2008- Intermediate/advanced course with Instructor Emmanuel Bragg
- 2007- Two day private instruction with Instructor Frank Garcia

3

*TODD JARRETT, INSTRUCTOR*

- 2008-Advanced Pistol Course
- 2004-Advanced Shooting Course
- 2004-Intermediate Competitive Pistol Course

*SIG SAUER ACADEMY*
Force on Force Operator Course (2008)

*SMITH & WESSON ACADEMY*
Law Enforcement Firearms/Pistol Instructor (2006)

*SCOTT WARREN, INSTRUCTOR*

- 2006 -Pistol Course

*SEVIGNY PERFORMANCE, LLC*

- 2005 -Pistol Course

*JERRY MICULEK, INSTRUCTOR*

Dynamics of Single Action Pistol (2004)

*NIGHTHAWK SYSTEMS*

Officer Safety and Tactics  (1994)

*MASSACHUSETTS CRIMINAL JUSTICE TRAINING COUNCIL –Agawam Academy*

*Reserve/Intermittent Police Officers (1993)*

*SCOTTI SCHOOL OF DEFENSIVE DRIVING*

VIP Protection Program (1988)

*CHAPMAN PRACTICAL SHOOTING ACADEMY*

Intermediate Pistol Craft Course (June 1985)

*JUNIOR OLYMPIC TRAINING CAMP*

Small Bore Rifle (August 1980)


## FIREARMS QUALIFICATIONS AND AWARDS

*HAMPDEN COUNTY SHERIFF'S DEPARTMENT LAW ENFORCEMENT DIVISION*

Firearms Qualification (1993-2017)

*INTERNATIONAL DEFENSIVE PISTOL ASSOCIATION*

Master Classification in Stock Service Pistol

4

Master Classification in Enhanced Service Pistol

Expert Classification in Stock Service Revolver

Expert Classification in Custom Defense Pistol

*CONNECTICUT STATE IDPA CHAMPIONSHIPS*

2nd Place Expert – CDP (2010)

High Law Enforcement (2009)

High Law Enforcement (2008)

2nd Place Expert –SSP (2007)

1st Place Sharpshooter –SSP (2006)

*MASSACHUSETTS STATE IDPA CHAMPIONSHIPS*

2nd Place Expert – CDP (2010)

2nd Place Expert – SSP (2008)

2nd Place- Expert – SSP (2007)

*SMITH & WESSON WINTER CHAMPIONSHIPS*

2nd Place- Expert – CDP (2010)

2nd Place- Expert – SSR (2006)

*NEW ENGLAND REGIONAL CHAMPIONSHIPS*

High Law Enforcement (2009)

2nd Place Expert – E. S. P. (2009)

1st Place Expert – E.S.P. (2008)

1st Place Sharpshooter (2004)

*NEW ENGLAND REGIONAL CHAMPIONSHIPS – DEFENSIVE PISTOL CHAMPIONSHIPS*

1st Place Expert – SSP (2008)

4th Place Expert – SSP (2007)

1ST Place Sharpshooter –SSR (2004)

*NATIONAL IDPA CHAMPIONSHIPS*

4th Place  Expert – SSP (2007)

*NORTHEAST REGIONAL, REVOLVER CHAMPIONSHIP*

5

1st Place Expert – SSR (2006)

1st Place Expert – SSR (2004)